E-FILED
Thursday, 20 October, 2022 10:13:46 AM
Clerk, U.S. District Court, ILCD

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

United States District Court
Central District of Illinois

Timothy Fredrickson,
    Petitioner

v                     No.

United States, Warden Rivers
    Respondant

### Writ of Habeas Corpus §2255

#### Bail pending disposition is requested

**Claim 1).** Dismissal of the indictment was mandatory because over 70 days ticked on the speedy trial clock because judge Darrow did not make a finding regarding the public's interest before she recused, and judge Mihm likewise failed to enter findings about the public interest before ruling on the motion to dismiss.

**Claim 2).** The statute is overbroad because it criminalizes activity even in the absence of the government's interest of safeguarding mental/physical harm.

**Claim 3.** It was error for the courts to fail to apply the Bose standard of review regarding unprotected character. Criminalizing "teen porn" goes beyond the category of "child porn" and the courts did not explain to the contrary, as a result, it was further error to avoid strict-scrutiny analysis.

**Claim 4).** Counsel did not ask for a suspended sentence

**Claim 5).** Counsel did not attempt to obtain a pretrial diversion agreement.

**Claim 6).** Warrantless search. The Iowa warrant was both executed and completed 14 minutes before the judge even authorized the warrant.

**Claim 7).** The warrant did not name a specific crime, by statute or otherwise, and the theoretically applicable statutes do not criminalize breasts.

**Claim 8).** The warrant was overbroad, and authorized search of irrelevant items

**Claim 9).** To the extent the warrant sought "mere evidence", it required a much higher standard in order to authorize a search

**Claim 10).** While the warrant authorized a search of the house, it only authorized a seizure of the phone, and thus the subsequent search of the phone was warrantless.

Claim 11). The phone was searched without any limiting principle or scope, either by filetype, date, filesize, or location/directory

Claim 12). Probing my pocket for a phone was a dickerson violation

Claim 13). powering on the screen was a search

Claim 14). The google warrant had no limited scope, by filetype, filesize, date, or otherwise, and was thus a general rumaging

Claim 15). The search of the video-security glasses after its seizure pursuant to arrest, was a warrantless search.

Claim 16). The inventory search of the parked truck was not authorized by local procedure, and was executed in bad faith.

Claim 17). The removal of the radio from the dashboard to search behind the radio is not consistent with the purpose of an inventory search, which is to protect against claims for theft, i.e. a search under false pretenses that is not protected by the intentory search exception.

Claim 18). The knock and announce violation warrants suppression in the criminal case because a civil remedy became unavalible (SOL) before the trial was able to be held.

Claim 19).The three-year retension of irrelevant property should merit a remedy such as suppressing fruits of the entire warrant, the flagrancy of which is now flouted by a current five-year retention.

Claim 20). The systemic violations of the 4th Amendment rights detailed above, from a cumulative approach, must be remedied by blanket suppression of anything obtained by the Moline/Davenport police

Claim 21). The prompt presentment requirement, and rule 5, were violated by interrogating instead of bringing me before a judge as soon as reasonable.

Claim 22). The prompt presentment requirement, and rule 5, was violated by intentionally avoiding the Iowa Federal courthouse (two block away), in forum-shopping favor of Judge Darrow at the Illinois Federal Courthouse who was unavalible by the conclusion of the interrogation.

Claim 23).  Faretta. I would have gone pro se, but could not because I was prevented from working with any of my discovery

Claim 24). Being forced to work with an attorney, I could not work with discovery to assist him in his assistance of me. To advise him of ommissions, discrepancies, and other things that cannot be gleaned from simply looking at discovery

Claim 25). The verbs "persuades" and "induces" plainly encompass abstract-advocacy in violation of the 1st Amendment, and a general verdict that potentially rests on either of the elemental alternatives cannot stand

Claim 26). The "jurisdictional element of "using materials that have" moved in commerce, attributes retroactive criminality to movement too far into the past to be sustained, and to movement too far removed from the core harms sought to be regulated. A conviction based on the movement of a phone prior to even knowing eachother, cannot be sustained.

Claim 27). The satisfaction of an element cannot be fosted onto persons other than the defendant. The jurisdictional element of "using materials that have" previously moved in commerce, cannot be satisfied by someone else doing the required useing of materials, and the materials must be the defendant's. A defendant must personally comit every element of the offense. A conviction based on evidence that Alice's phone moved in commerce prior to her using it to produce a depiction, cannot stand.

Claim 28). The commerce clause authority cannot be used to reach a class of conduct that has no effect on commerce.

Claim 29). The commerce clause authority cannot be used to regulate a separate "market" whose "comodity" merely resembles an illicit market/comodity based soley on said resemblence and nothing more.

Claim 30). The indictment failed to charge the required mens rea element of "with intent that such minor engage in", a required state-of-mind element that separates conduct worthy of a 15-year mandtory minimum, from conduct criminalized by §1466A(a)(2) (intended vs knowingly permitted)

Claim 31). The "for the purpose of" element of §2251(a) does infact require but-for causality. Had the court recognized this, the defense stratagy at trial would have been radically different.

Claim 32). Lesser included offense. §1466A(a)(2) is a lesser included offense of §2251(a) and the defense would have raised a lesser included offense instruction.

Claim 33). The statute is unconstitutionally vauge

Claim 34). The addition of the word "anus" in the jury instructions, was an Ex Post Facto violation, because "anus" was added in a 2018 amendment and the indictment was brought in 2017.

Claim 35). The indictment was constructively amended by the addition of the word "anus" which was not returned by the grand jury

C;aim 36). The indictment was constructively amended by broadening the convictable basis through the inclusion of the word "includes" in instruction 16, which subsequently gave the statutory phrase "sexually explicit conduct" unlimited scope.

Claim 37). The indictment was constructibely amended by broadening the convictable basis through the inclusion of the word "transported" in instruction 15, which was not returned by the grand jury; The grand jury returned the statutory alternative of "transmitted" instead.

Claim 38). The indictment was constructively amended by broadening the concvictable basis through the inclusion of the word "mailed" in instruction 15, which was not returned by the grand jury; The grand juery instead returned the statutory alternatives of "shipped" and "transported".

Claim 39). The indictment was constructively amended by broadening the convicable basis through the inclusion of the phrase "across state lines" in instruction 15, which is not part of the statute. The statute instead requires movement "in interstate commerce". Moving "across syate ines" can be accomplished without moving "in interstate commerce".

Claim 40). The indictment lacked the required facts under Rule7(c). Current law has been eroded to simply a requirement to insert the time, district, and defendant's name into the statute verbatim, as long as clearly irrelevant elemental alternatives are eliminated.

Claim 41). The only supplemented fact is the vauge description "a 16 year old girl"; which renders the indictment unconstuitutionally vauge.

Claim 42). There was no juror unanimity between the statute's alternate elemets of "employs, uses, persuades, induces, entices, coerces"

Claim 43). There was no requirement that the jury be unanimous between two elemental alternatives, in finding whether it was a depiction that had moved in commerce, or instead the object that was used to produce it had moved in commerce.

Claim 44). In regard to the precursor object, there was further no requirement that the jury be unanimous in finding whether the precursor object had been "shipped" or "transported" in interstate commerce.

Claim 45). In regards to any depictions, there was further no requirement that the jury be unanimous in finding whether a depiction was "transmitted" or instead "transported" in interstate commerce.

Claim 46). The defenase was precluded from offering evidence that directly refutes the charged element of "coerces"; namely, consent. Inability to argue consent as a defense to coercion also manimested as a confrontation clause violation, because the witness could not be asked about consent.

Claim 47). The defense was precluded from arguing that no image had moved in interstate commerce, because of an errounous instruction stating that any involvement of the internet is matter-of-factly commerce.

Claim 48). The defendant requested a special verdict, and subbmitted a proposed special verdict form which would have prevented claims 26, 27, 42, 43, 44, 45

Claim 49). The statutory elemental alternatives of "employs, uses, persuades, induces, entices, coerces" are draffted in a way thqat on thier face conflict with each other (entice/coerce), a denial of due process will result, because a defenflant cannot disprove one without proving another. A hobsons choice

Claim 50). A trial in Iowa with a judge and jury from illinois, is a defacto  proof that a defendant is arbitrarily denied the right to be tried by a jury of his peers in the districts wherin the crime shall have been committed.

Claim 51). Fredrickson was denied a fair cross-section of bhe community when Iowa jurors were completely excluded.

non

Claim 52). Fredrickson was denied a fair cross-section of his community when all non-voters were completely excluded from the possibility of jury duty

Claim 53). Fredrickson was denied a fair cross-section of the community when the vast majority of like-aged persons were systematically underrepresented and excluded by failing to include, within the jury wheel, persons who did not register to vote

Claim 54). The introductory voir dire questions were only directed to the veniremen who were currently seated in the jury box, and after a substantial change in jurors seated in the box, the new jurors were not re0-asked the original questions so as to answer; which prevented an assesment of bias, and resulted in a defacto abortion of the voir dire process.

Claim 55). The circuit's reason behind not giving a "reasonable doubt" instruction (that the term is well understood) is nolonger true, and necessitates an instructin in order to have a fair trial by that standard.

Claim 56). Fredrickson's counsel, Donovan Robertson, while not defining what "beyond a reasonable doubt" is, never the less defined preponderance and "clear & convincing evidence" in order to state that whatever it is, that it is a higher standard than those. Counsel's statements about the clear & convincing evidence standard, to the lay juror, was taken instead as an admission that the government's evidence was is clear and convincing, virtually dooming Fredrickson

Claim 57). The defense counsel misunderstood the peremptory-strike erule as not permitting what Donovan Robertson called "back-striking", which caused Fredrickson not to strike two jurors.

                                                                                                not
(Claim '58). The defenase counsel misunderastood the peremptory-strike rules as permitting extra strikes for the alternate jurors.

Claim 59). The miranda warnings given to Fredrickson at the police station did not convey that the right to an attorney was a right to have an attorney present for that very interrogation.

Claim 60). Fredrickson's statements at the police station should have been suppresed based on the totality of the circumstances, which included zero experience with  police, never being arrested before, being lured to thestation under false pretenses, ambush arrest mere feet from a windowless interrogation chamber behind a locked door on the second floor

Claim 61). The officer in the interrogation room promised leinency in exchange for discussion.

Claim 62). In the initial bathroom interrogATion durreing the search, the officers locked me in the bathroom, took my keys, would not permit me to leave, and I would have had to get past a dozen armed officers, and past the officer in the bathroom with me blocking the door.

Claim 63). The court gave an Allen charge other than the perscribed Silvern instruction.

Claim 64). The jury saw me in jail uniform and other indicia of incarceration for an extended period of time.

CXlaim 65). Brady. The defense was never given a copy of the contents of the video glasses

Claim 66) Brady. The defense was not provided with a copy of the criminal records of its principle witness, Jerymy McAullife

Claim 67). Brady. McAullife's admission that it is his usual practice to look behind radios when doing an inventory search ostensibly to prevent claims of theft of any hidden items,.

Claim 68). Brady. The defense was not given a transcript of any communications between the prosecutors and Alice.

Claim 69). Brady. Chain of Custody. The prosecutor had personal possession of a key piece of evidence prior to trial, and transferred personal possession of the same to Alice before trial. This fact was sprung on the defense in the midst of trial.

Claim 70). The defense was prevented from consultinfg with counsel during a substantial recess, namely lunch and a period thereafter, both days of trial

Claim 71). failure to personally possess discovery is a constitutional violation.

Claim 72). during closing argument, the government passivily said, "its not our burden to prove he coerced her" and thereby dispensed with the presumption of innocence. This statement does not appear in the written transcript.

Claim 73). Fredrickson was prevented from hiring counsel of chioce, Harry Zimmerman, because the government's prolonged and unnecesarry retention of items divorced of alledged crime meant that Fredrickson could not sell his property to fund choice counsel.

Claim 74). There were no african-american individuals in the jury, or even in the jury pool,

Claim 75). A large TV was intentionally placed where it blocked the view of over half the jurors from seeing Fredrickson, and vice versa.

Claim 76). The district court should have declared a mistrial.

Claim 77). The districy court should have struct the juror who saw Fredrickson on the second day of trial.

C;aim 78). The defendant was not permitted to take part in the sidebar alongside counsel.

Claim 79). No evidence was presented that any object had moved in interstate commerce.

Claim 80). Cummulative error.


I Tim Fredrickson, to declare under penalty of perjury that the staments contained herein are true, under penalty of perjury.

/s/ TIM FM/
Oct 5th 2022

*Argument for claim 2.*

## Questions presented for review

Whether by extending section 2251(a) to criminalize the private choice of college students and married couples to depict their own intimacy, Congress has deviated so far away from its interest in preventing physical injury and mental harm as to be overbroad.

Whether the court erred in holding that the government can evade review by extending the category of "child porn" to the private and consensual intimacies of married couples and college students where there is no expectation of physical injury or mental harm.

**The Supreme Court has never vetoed overbreadth analysis on behalf of an "unprotected category"**

It is commonplace for courts to entertain challenges to "unprotected" speech[9]. In overzealous

state laws attempting to regulate child porn, the Supreme Court has faced a challenge to their breadth at

least four times with varied results[10], never refusing review because this "unprotected" category was

involved.

The first was *Ferber*, bearing in mind that only the *nude* works of those *under* 16 were targeted,

it rested its decision on the observation that "how often [] it may be necessary to employ [those younger

than 16] in order to produce educational, medical, or artistic works cannot be known with certainty… [to

find] these arguably impermissible applications of the statute amount to [] a tiny fraction". *Ferber @773;

Osborne @ftn11*. Importantly, "the [Ferber] court recognized some works in this category might have

significant value" and heavily relied on the availability of two "alternative mode[s]"[11] to produce these

works. *Ashcroft @251*. The curtailment of either alternative, alone and in combination with the

broadening effects of the raise in age, all further aggravated by the lack of a nudity requirement[12] -- easily

---

[8] Supreme Court Rule 10(c) "decided an important Federal question in a way that conflicts with relevant decisions of this court". See eg Osborne@112 ftn 9 ("Given the broad statutory exceptions"); Ferber (limited to nudity and statute contained mistake of age defense).

[9] See New York Times v Sullivan, 376 us 254 @269 (1964) ("Like insurrection, contempt, advocacy of unlawful acts, breach of peace, obscenity, solicitation of legal business, and the various formulae for the repression of expression that have been challenged in this court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the 1st Amendment"); See e.g. Lewis v New Orleans, 415 us 130 @132 (1974) (Louisiana "court took the position that, as written 'it [§49-7] is narrowed to 'fighting words'… but §49-7 plainly has a broader sweep than the constitutional definition of 'fighting words' announced in Chaplinsky"); Miller @19-20 ("we are called on to define the standards which must be used to identify obscene material …the court now undertakes to formulate standards more concrete than those in the past").

[10] In chronological order: Ferber (distribution statute upheld); Oakes (production statute fatally overbroad); Osborne (possession statute upheld); Ashcroft (virtual production Amendment severed); Williams (pandering statute narrowed).

[11] See Ashcroft @251 quoting Ferber @763 ("for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized. Simulation outside of the prohibition of the statute could provide another alternative").

[12] Compare Ferber@773 ("Nor will we assume that the New York courts will widen the possibly invalid reach of the statute by giving an expansive construction to the proscription on 'lewd exhibition[s] *of the genitals*'") with "it was and is the intent of congress that [] the scope of 'exhibition of the genitals or pubic area' in section 2256(2)(E), in the definition of 'sexually explicit conduct', is *not limited* to nude exhibitions or exhibitions in which the outlines of those areas were discernable through clothing" (Act Sept. 13 1994 P.L. 103-322, Title XVI, §160003(a), 108 Stat. 2038). See also Miller v US, 940 F.3d 371 (CA7 2019) ("congress did not define 'lascivious exhibition', and federal courts have struggled to define the term with much precision or particularity").

suffices to distinguish the federal statute. At the very least, *Ferber* does not foreclose review[16].

Next the Supreme Court faced a Massachusetts production law with exactly these characteristics. It's "pose or be exhibited in a state of nudity or participate or engage··· in any act that depicts, describes, or represents sexual conduct" ban on those under 18 essentially criminalized "simple nudity" unless "specifically prepared, in accordance with    29A's exclusion, for museums and libraries". *Oakes @ 579*. The Supreme Court *unanimously* found it overbroad, and was only divided as to the remedy because after it "granted certiorari,    29A was amended··· add[ing] a 'lascivious intent' requirement to the 'nudity' portion, but not the 'sexual conduct' portion of    29A. In addition, the current version of the    29A contains no exemptions". ID @582-83. The court crucially went to great lengths to emphasize the frequency and value of such works, which naturally increase in both societal value and frequency of production in proportion to age. See *Oakes @593*. These demonstrably common and socially acceptable[13] images are also covered by the Federal production statute, as will be demonstrated in the next sections.

The third Child Porn case the Supreme Court analyzed was an Ohio possession regulation. While also broadly criminalizing nude images of those under eighteen[14], this time *the exemptions were equally as broad and were crucial to saving the statute*, or as the Supreme Court recognized:

> The statute applies only where an individual possesses or views the depiction or a minor "who is *not* the person's child or ward". The state, moreover does *not* impose criminal liability if either "the material or performance is sold, disseminated, displayed, possessed, controlled, brought or caused to be *brought into this state*, or presented for a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other *proper purpose*, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, clergymen, prosecutor, judge, or other person having a *proper interest* in the material or performance" or "the person knows that the parent, guardian, or custodian has *consented in writing* to the photographing or use of the minor in a state of nudity and to the manner in which the material or performance is used or transferred".

*Osborne @ftn 9*. The federal statute does not contain *any* of these exemptions that saved the Ohio statute. A prosecutor can hardly be expected to prosecute themselves or the police under the Federal statute, though plainly falling within it's sweep. These crucial exemptions also eliminated the overbreadth of

---

[13] Ashcroft @246 ("The statute proscribes the visual depiction of an idea –that of teenagers engaging in sexual activity—that is a fact of modern society and has been a theme in art and literature throughout the ages").
[14] The definition of "minor" was hard-linked to, and imported from, the Ohio rape statute. The federal counterpart conflicts. Compare §2243(a)&(c)(1) (sixteen) with §2256(1) (eighteen).

another clause in the Ohio statute; the court was "unable even to hazard a guess as to what a 'lewd exhibition' might mean", but held that "*given the broad statutory exceptions··· it is far from clear that the instances where the statute applies to constitutionally protected conduct are significant enough to warrant a finding that the statute is overbroad*". ID@ 133,112 ftn 9. In other words, the court *did* undertake an overbreadth analysis at the center of which were exceptions. As detailed later, this same ambiguity regarding "lewd exhibitions" is present in the federal statute, but this time there is no statutory exemption to save it. Among other defects, the Supreme Court's concern clearly signals that a court *must* entertain an overbreadth challenge.

### (a) The statute's compelling interests were not present in this particular case and the statute is categorically overbroad in its application to all those who may legally consent to the underlying sexual conduct under federal law

In both facial[15] and as-applied challenges to any law, the first step is the same --we must identify the precise "compelling interest" it is intended to further; this is the only way to know how much of a statute's sweep is "plainly legitimate". If that interest is not protected by a particular prosecution, then the statute is unconstitutional as applied[16]. If the interest is not protected in a sizable number of a law's actual or potential[17] applications, a substantial portion, then the statute is facially[18] overbroad and a court must either apply a limiting construction to limit the statute to the compelling interests or strike down the offending portion of the law that oversteps those interests. A court may also strike down an amendment[19], leaving a prior version

---

[15] Stevens @446 (recognizing three types of facial challenges)
[16] "Whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assuredly, may not be applied". Ferber@773-74. See also Williams @302 ("footage could of course be the subject of an as-applied challenge")
[17] "The possibility of a substantial number of realistic application in contravention of the First Amendment, however, suffices to overturn a statute of its face". Oakes @595
[18] Oakes @590-91 "If the statute is excessively overbroad, we have no choice but to strike it down on its face, notwithstanding its laudable objective and its numerous permissible applications; if it is not, then Oakes and others charged under it may argue only that their actions, though forbidden by statute, may not constitutionally be proscribed".
[19] Barr v Ass'n of political consultants, 140 S.Ct. 2335 @2353, 207 L.Ed.2d 784 @801-02 (2020) "The court has long applied severability principles in cases like this one, where congress added an unconstitutional amendment to a prior law. In these cases, the court has treated the original, pre-amendment statute as the 'valid expression of the

of the law standing.

**(1) Step 1: Identifying the compelling interests of    2251 with the required particularity**

The basic premise of "child pornography" is that you must physically and/or mentally

harm the subject to create an image. At the highest level of generality[20], the goal is to punish

anyone who causes, or would cause, physical or mental harm[21]. This requires some unpacking[20],

which is a necessary predicate for the ultimate determination of what the statute's intended target

is (plainly legitimate sweep), and what applications go beyond that reach (are overbroad).

Generalizing the "compelling interest" is also dangerous because it renders the statute susceptible

to a challenge as being "underinclusive" in relation to the interest it is meant to protect[22]. It would

be grossly under inclusive within the universe of images that require physical harm in their

production[23], to only ban the subset of sexual ones[24]. As the following analysis makes clear, an

examination of the contours of these twin interests reveals a systemic defect.

**(A) Physical harm**

The sexual assault statutes naturally inform the baseline of this interest, as they

exclusively involve physical conduct. In *US v Shannon, 110 F.3d 382 (CA7 1997 enbanc)*, Judge

---

legislative intent'". (collecting examples). It may be easiest to excise the 1984 amendment to §2256(1) which raised the age for photography from 16 to 18 to better facilitate the prosecution on behalf of 15 year olds.

[20] "By stating the public interests so generally, the government guarantees that the mandate will flunk the test. ··· Stating the governmental interests at such a high level of generality makes it impossible···". Korte v Sebelius, 735 F.3d 654 @686 (CA7 2013).

[21] See Ferber @761("the issue of whether a child has been physically or psychologically harmed in the production of the work").

[22] "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint" (Nat'l institute of Family & Life Advocates v. Becerra, 138 S.Ct. 2361 @2376 (2018) quoting Brown @802); see also Reed v. town of gilbert, 576 us 155 @172 (2015) ("a law cannot be regarded as protecting an interest of the highest order ···when it leaves appreciable damage to that supposedly vital interest unprotected").

[23] Sports like Wrestling, Boxing, MMA, or YouTube imitators of "Jackass", the latest TicToc challenge, or schoolyard fights to name a few examples.

[24] The highest New York court below in Ferber, found the statute fatally defective on exactly this basis --a fact this court acknowledged but did not address. See Ferber@752 ("found two fatal defects in the New York statute. Section 263.15 was underinclusive because it discriminated against visual portrayals of children engaged in sexual activity by not also prohibiting the distribution of films of other dangerous activity").

Posner noted that "the likelihood of physical injury as a consequence of sex is" inversely proportional to age. ID@387. There are also relevant delayed considerations. See eg ID@388 ("The medical complications of pregnancy are plainly a form of physical injury"). There are of course situations where there is *no physical harm at all*; these include pin-ups, paintings, poses, voyeurism, masturbation, and morphed[25] pornography. Taking a picture does not cause physical harm; the statute instead, out of necessity, focuses on *why* any physical harm occurred --"for the purpose of producing a depiction" (   2251(a)). Another consideration is that the strength of that interest (on a scale of "legitimate" to "overriding") necessarily varies[26]. For example the mere stubbing of one's toe or a papercut would be so de minimis as to no longer qualify as a "compelling" interest. For these situations, the statute's valid application must instead rely on the other interest is was designed to protect.

### (B) Mental harm

The presence of mental injury or damage to psychological wellbeing is more difficult to identify[27], but it is immensely helpful to remember that the mental harm is to be viewed through the narrower lens of the statute at hand, here a production ban. Just as one cannot be physically harmed by distribution, the particular manifestation of mental injury supporting    2251(a) is limited to the production process itself[28]. Non-consensual touching like rape and molestation, even if not causing physical injury, are obviously traumatizing "beyond the need for elaboration"[29] and immediately incur mental harm. Mental harm does not need to be

---

[25] See eg *US v Anderson, 759 F.3d 891 @895 (CA8 2013)* ("whereas the image in Bach recorded the sexual abuse of the nude minor who was posed in the original image, Anderson's morphed image superimposed M.A.'s face onto an image of two adults. No minor was sexually abused in the production of Anderson's image").

[26] See Gilmore v. Robinson, 117 F.3d 368 @374 (CA 8 1987) ("The state's interest in protecting minor's from themselves becomes less weighty as their" age increases). See also US v Kantor, 677 F.Supp. 1121 @1429 ftn. 42 (C.D. Cali 1987) ("Sufficiently 'adult' as to no longer be the legitimate subjects of protection of 'children' ⋯ in this court's view, the societal interest in protecting 16 and 17 year old 'children' begins to be strained").

[27] Largely because objective indicators are far and few between, and an objective point may none-the-less be subjectively absent in a particular case.

[28] "The objective is to prohibit illegal conduct"(Ashcroft@252); "creates no victims by its production" (ID@250).

contemporaneous and instead may accrue when knowledge of production is later attained, such as if the victim were asleep, drugged, tricked, or otherwise unaware of the fact of production. The only limit to mental harm (as safeguarded by a ban on *production* of an image) is that it must be directly linked to knowledge of production[30]. One cannot suffer mentally from something they do not even know happened; this is particularly true for both paintings and morphed[31] pornography, where the subject does not even have to be present.

There are of course many situations where there is no expectation of mental harm[32] (such as within a marriage) and where mental injury simply does not exist. It is a hard sell to claim a husband and wife, both able to legally engage in sex, suffer inherent mental harm simply because one of them took a picture. The same is no less true for those able to consent to sex under federal law --one cannot incur mental injury (much less inflict it upon themselves) by simply taking a picture.

**(C) Effective enforcement. Congress relied on a distinctly different interest to justify overriding the Free Speech right of 16 & 17 year old adults**

Without regard for physical/mental health, exclusively in the name of easier enforcement, and for no other reason – Congress raised the effective age of prosecution by two years above the age of consent. The Congress's methodology is best explained by now Circuit Judge David Hamilton

---

[29] N.Y. v. Ferber, 458 us 747 @756-57 (1982) ("It is evident beyond the need for elaboration that a state's interest in 'safeguarding the physical & psychological wellbeing of a minor' is 'compelling'").

[30] Mental health as safeguarded by a ban on distribution is not at issue in this case and is thus not challenged. See also Osborne@ftn36 (Brennan, Marshall, Stevens dissenting) ("In Ferber, the court was careful to limit its discussion to the 'distribution' and 'circulation' of photographs taken without a minor's consent")

[31] The Supreme Court expressly saved this question for another day. See Ashcroft @242 ("Morphed images ···respondents do not challenge this provision, and we do not consider it").

[32] "An odd day arises when a young man who could legally have consensual sex with his 16-year-old girlfriend, will forever be labeled a sex offender for receiving provocative pictures of her that she sent him via text message"( US v Nash, 1 F.Supp.3d 1240 N.D.Ala 2014).

In 1984, Congress raised the upper age limit for federal child pornography from 16 to 18 as part of public law 98-292, the Child Protection Act of 1984. To explain the change, the committee reported that it is often impossible to locate the child in a child pornography case, so that the images are the only evidence of the child's age. H.R.Rep. No. 98-536, reprinted in 1984 U.S. Code cong. & Ad. News 492, 494. The prosecution had found it "extremely difficult" to prove beyond a reasonable doubt that a child was under the age of 16 if the child showed any signs of puberty. Raising the age to 18 "would facilitate the prosecution of child pornography cases and raise the effective age of protection of children from these practices probably not to 18 years of age, but perhaps to 16". ID. The section-by-section summary *repeated* this explanation and explained that a conviction could thus be obtained "if the child does not look like an adult". ID@498-99.

*Rinehart*. Similarly, District Judge Spencer Letts of the Ninth Circuit made a finding that

When Congress amended section 2251 in 1984 by raising the specified age from 16 to 18, the legislative history can be interpreted as an indication of congressional intent to facilitate the prosecution of cases involving 13 to 14 year olds. See 129 Cong. Rec . H9780 (daily ed. Nov. 14, 1983) (statement of Rep. Pashayan) ("the Bill raises to 18 years from 16 the age of children depicted in child pornography, *to aid prosecutors* in identifying one age of youngsters depicted in these materials while some 13 and 14-year-olds may pass for16, they will rarely pass for 18"); *US v Sherin, No. 86-00480, Lexis 458 (S.D. NY Jan-28-1987)* ("Congress was *clearly* less concerned with prosecuting cases involving 17 year olds then with making it apparent that 13 & 14-year-olds were children within the law").

*Kantor @1429 ftn 42*. The Supreme Court has confronted such methodology before, dealing

with the very same subject matter.

The necessary solution, the argument runs, is to prohibit both kinds of images. The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down. The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse. 'The possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted'. Cite.

*Ashcroft @254-55*. Surely this is to burn the house to roast the pig. Whether the interest is a compelling one like safeguarding the physical/mental health of younger citizens, or merely a legitimate interest in effective prosecution; Legislation affecting a communications medium must be "restricted to the evil with which it is said to deal". *Butler vs Michigan, 352 us 380 @383 (1957)*. Where the *constitution* draws the dividing line between protected and unprotected speech or more importantly how to define that line, is the real question this case presents. The courts below made the mistake of looking at where a *statute* draws that line. Put simply, the speech of 16 and 17 year olds "fail[s] to trigger the concern for child safety that disentitles child pornography to the First Amendment protection". *Williams @313-14*. Were

Congress concerned for 16 and 17 year olds, it would have said so and amended  2243 to raise the age from 16 to 18. The Government needs a far stronger justification to trample on the rights of 16 and 17 year olds. The Government has offered nothing to rebut the presumption that "as a general matter pornography lacks the harm to justify prohibiting it. … The exception to the general rule rests not on the content of the picture but on the need to foil the exploitation of child subjects, and the justification limits the exception… . *Williams @310*. "Thus, the only stated Congressional purpose for raising the age limit to 18 is not served at all by the prosecution in this case, where the victims and their ages are known and readily provable to be 16 and 17. (USA v. Rinehart, Lexus 19498, No. IP 06-0129-CR 1 H/F USA v Rinehart, 02/02-07, District judge David Hamilton, now 7th circuit judge.

### (2) Step 2 Determining whether the production ban reaches beyond the compelling interests

This court has *already* found that "the prohibition on 'any visual depiction' does not depend at all on how the image is produced"[33] Ashcroft @241. In every Supreme Court case analyzing an image ban's overbreadth, the exemptions (stated differently as when physical/mental injury is likely absent), was the very foundation of the decision. This underscores the problem of the federal statute; as one district judge aptly put it:

> Section 2251(a) is a blanket prohibition, it brooks no exceptions. A 17 year old performer cannot volunteer to do the proscribed act, nor may parents consent even if they believe that the performance would be in the performer's best overall interest. Congress has made the determination that there are absolutely no circumstances in which even the best collective judgement of all directly affected persons may be acted upon. This blanket legislative intrusion into the right of individual choice in an area of First Amendment expression is not to be dismissed lightly

Kantor@1430. A brightline and unreviewable legislative judgement, that all conduct "below a specified age" irrebutably involves physical/mental harm in all cases, that no inquiry into the presence of harm is necessary, is to rob society and jury of a fact it is designed to find.

---

[33] Similarly, in the Ohio statute, three judges observed the defect that there was "no requirement that the state show that the child was abused in the production of the materials or even that the child knew that a photograph was taken" (Osborne @143 ftn. 18), but Mr. Osborne could not argue this point.

Many courts and scholars have complained that age is an arbitrary metric to measure harm, especially since the statute reaches far more than just intercourse. By using age as a proxy, rather than making the harm itself a statutory requirement, 2251 is both underinclusive and overbroad in relation to the asserted interest of preventing harm. There are many ways to show harm, and a prosecutor may very well use age to do it in an appropriate case, but failing to actually require harm is a plainly obvious –and fatal—defect.

As a continuing theme throughout this petition, there are numerous cases where, as a factual matter, there is not even an allegation of physical or mental harm. Consider the words of a retrospectively speaking Traci Lords[34], or more recently an adult Miley Cyrus who produced morphed child pornography of her childhood self in support of feminine equality --nothing short of political speech. **Exhibit A.**

### (3)  Step 3: Determining whether the situations that don't implicate physical or mental harm, are substantial enough to warrant a *facial* remedy.

The only question remaining is whether 2251(a)'s overbreadth is *substantial*. Under a qualitative approach, it has already been demonstrated that 2251(a) applies to married couples, college students, selfies, political speech, and even a prosecutor's PowerPoint presentation. These are substantial categories that are quite the opposite of child abuse. See also qualitative analysis table. Exhibit D.

A population based quantitative analysis demonstrates an even starker contrast. Because federal law permits 16 and 17 year olds to engage in sex itself with other adults of any age, Congress has no legitimate interest in their physical well-being, and has never offered a reason

---

[34] "I don't think I did anything that special or weird or different. The only difference was that I did it on video. Every teenage cheerleader runs around, screws half the football team, and takes drugs" Michael Kaplan's The House of Lords, movie line, Jan/Feb. 1993 @71,72.

why mental harm would be present for such persons –nor more importantly why the mere prospect of mental harm alone would justify overriding their personal choice.

This limited class of adults, regardless of whether they choose to avail themselves of the rights they are entitled to under the Constitution, are no less entitled to make that choice for themselves. Thus the appropriate number of persons to consider in a quantitative analysis, is the entire United States population of 16 and 17 year olds. Approximately ?000,000. See exhibit. This number substantially outweighs the number of federal prosecutions several times over. It could not be more clear that the statute's legitimate applications are or would be dwarfed by the illegitimate applications.

**(a)The 15-year mandatory incarceration results in a low bar for a successful facial over breath challenge.**

Not only is the Federal statute significantly more broad than Ferber, the bar for showing substantial overbreadth is half as high.

"[I]t bears emphasizing that 'the penalty to be imposed is relevant in determining whether [the] demonstrable overbreadth is substantial'" *Oakes @595 quoting Ferber @773.* In Oakes, a fine of 10-50 thousand and/or a prison term of 10-20 years, was found to *"significantly* reduce [] the degree of overbreadth that the constitution permits". *ID@596.* The federal penalty is far more severe with mandatory incarceration of at least 15 years and fines up to a quarter million, thus the amount of overbreadth Fredrickson must show here is "significantly reduce[d]".

*Ferber* underscores the extent of this "significant" reduction; the *minimum* Federal penalty of 15 years is *more than twice* the *maximum* New York penalty in *Ferber*. See *ID@ftn3* ("a maximum punishment of imprisonment for up to seven years… respondent Ferber was sentenced to 45 days"). See also *Osborne@107* ("Osborne was… sentenced to six months in

prison"). This means that the lower hurdle Fredrickson must clear is at least two times lower here than in *Ferber*.

The minimal (and optional) in cursor all penalties in *Ferber* and *Osborne* are a sharp contrast to the required Federal penalty of 15 years, which "does appreciably shrink the amount of overbreadth we find constitutionally tolerable, *particularly* when the penalty is severe". *Oakes@595*. The teachings of *Oakes* are particularly salient because it's penalties were both far more severe than those in *Ferber* and *Osborne*, and far closer to the Federal penalties here.

> In this case, there is no gainsaying the gravity of the penalties meted out for the violations of   29A. Infractions carry a fine of between $10,000 and $50,000, a prison term of between 10 & 20 years, or both. Respondent was himself sentenced to 10 years' imprisonment for taking fewer than a dozen snapshots of his stepdaughter, which he apparently showed no one except [her]. The severity of these sanctions significantly reduces the degree of overbreadth that the constitution permits.

*Oakes@596*. It bears repeating just how much more severe the Federal penalty is. With the harshest sanction in the entire U.S.C. for a first-time offender, even a small amount of overbreadth will be fatal.

Having more than demonstrated a prima facie case of overbreadth, in that such a challenge is not forclesed[15], this court should not hesitate to                develop a record, and dissuade future courts in many different kinds of cases from making the same mistake.

Tim Fredrickson     |
Petitioner     |
v.     |
Respondent     |

**Prevailing Habeas Standard**

Through the lens of ineffective-counsel, Habeas Corpus permits *all* claims, including *non*-constitutional issues, because the right to effective counsel *is itself* a constitutional issue. See Belford v US 975 f.2d 310 @313 CA7 (1992), broadened on other grounds by Massaro v US, 538 us 500 @504 (2003) ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under §2255, *whether or not* the petitioner could have raised the claim on direct appeal"). This is so even if the pretrial/trial record contains clear indicia of deficiencies in counsel's performance (Massaro). This also includes claims constitutional in their own right, though brought via ineffective counsel. See Kimmelman v Morrison, 477 us 365 @382-3 (1986) (explicitly allowing a 4th Amendment claim. "We hold that federal courts may grant habeas relief in appropriate cases, regardless of the nature of the underlying attorney error").

**Prevailing Ineffective-Counsel Standard**

Strickland's first prong (whether counsel's act or omission was within prevailing professional norms) is highly deferential, but only to counsel's *objectively reasonable* tactical or strategic choices. The second prong (prejudice) is subjective and has a very low threshold, lower than preponderance. See Strickland@693 ("a defendant need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case"). The standard is "that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been *different*. A reasonable probability sufficient to undermine the confidence in the outcome"(ID@694). See also Glover v US, 531 us 198 @203 (2001) (reaffirming standard).

### Claim 1 . Counsel was ineffective for bringing a Speedy trial act ~~claim~~ on Appeal

*not*   *violation*

**Standard**

"We review a district court's interpretation of the [speedy trial] act De Novo, and its decisions to exclude time for abuse of discretion"(us v. Bell, 925 F.3d 362 @373, CA7, 2019). "In reviewing the district court's speedy trial act ruling, we examine its legal conclusions de novo and its factual findings for clear error" (us v. Adams, 625 F.3d 371 @377, CA7, 2010). "Absent legal error, our review of the excludability of [ends of justice] continuances is deferential" (ID). "Without an evidentiary hearing, we are forced to assume as true the allegations made in [defendant]'s motion to dismiss" (us v. DeLeon, 710 F.2d 1218 @1220, CA7, 1983).

**Argument**
**Failure to calculate**

"In ruling on a defendant's motion to dismiss, the court must tally the <u>unexcluded</u> days"(Zedner v. us, 547 us 489 @507 (2006)). A finding of the number of days is a factual finding, a failure to calculate the days at all is legal error. In the district court below, the government did not dispute Fredrickson's evidentiary facts (#129 @2-12) with any specificity of its own, thus this court is "forced to assume as true the allegations made in [Fredrickson]'s motion to dismiss", but a remand is requested because this court's role should not be of first view. The district court also failed to "tally the unexcluded days" to determine whether more than 70 unexcluded days passed, thereby committing legal error. For the sake of simplicity, three oversights have caused over 70days which are not attributable to any kind of

exclusion: 1) from indictment (3/21/17) until the first purported ends-of-justice (hereinafter "EOJ") exclusion on (4/27/17) 37 days passed. 2) The next EOJ exclusion on 2/14/18 expired on 4/16/18; even assuming arguendo that excessive examination days pause the clock, the time between the exam completion date (7/25/18) and the hearing (9/6/18) added another 43 days. 3) The next gap was the EOJ exclusion of 9/4/19 which expired on 12/9/19, and it appears there were no further exclusions. 37 + 43 +? =more than 70.

**Failure to consider the public interest is legal error**

Over one thousand days passed because no EOJ continuance considered the public interest. When a court "applie[s] only half of the prevailing legal standard [] is necessarily an abuse of discretion" (Pruitt v. Mote, 503 F.3d 647 @649, CA7 2007). Assuming arguendo that all delay is exclusively the fault of the defense (in esse the 2nd circuit's position in Zedner@496-7) and the dubious proposition that such de facto outweighs the defendant's interest in a speedy trial; such excludability was expressly rejected by the Supreme Court in Zedner because of the *public's* concurrent interest

> ("the act was designed with the public interest firmly in mind. See e.g., 18 §3161(h)[7](A)(to exclude delay resulting from a continuance --even one 'granted ••• at the request of the defense'-- the district court must find 'that the EOJ served ••• outweigh the *best interest of the public* and the defendant in a *speedy* trial'). ••• The senate report accompanying the 1979 amendments to the Act put even finer point on it: 'the Act seeks to protect and promote speedy trial interests that go beyond the rights of the defendant'"(Zedner@501[emphasis in original]).

See also Bloate v. US, 559 us 196 @211 (2010)("We recently explained that the Act serves not only to protect defendants, but also to vindicate the public interest in the swift administration of justice"). The 6th, 10th, and DC circuits are all in alignment that "It is the responsibility of not only the district court, but also the government to protect the interests of the public by ensuring adherence to the requirements of the speedy trial act"(us v. Deangelo, 510 Fed. Appx. 930 @ftn5, CA6, 2013 quoting us v. Toombs, 574 F.3d 1262 @1273, CA10, 2009 citing us v. Wright, 6 F.3d 811 @814, DC App, 1993). See also US v Ramirez-Cortez, 213 F.3d 1149 @1156 CA9 2000 ("a defendant cannot 'waive' time under the Speedy Trial Act. ··· 'the right to a speedy trial belongs not only to the defendant, but to society as well'").

**Timing, completeness, and placement of findings**

It is one thing to contemporaneously balance the public interest and disfavorably delay (or fatally neglect) in *entering* those findings, it is quite another to fatally fail to *contemporaneously balance*. The findings of the public interest needed to be made contemporaneously, and it is too late to remand to the recused Judge Darrow for those findings. See Zedner@506("In the first place, the Act requires express findings, and in the second place, it does not permit those findings to be made on remand as the government proposes"). See also Cortez@1154 ("The district court judge, a different judge than the [] judge who excluded the time, could not make that showing here"). Similarly, even if Judge Darrow had found a balance "if only in the judge's mind", it is now *too late* to place the finding in the record as of Dkt#129, 143, and trial. See Zedner@507("At the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under §3162(a)(2)"). Congress and the supreme court could not have been more clear: "§3161(h)[7](A) is explicit that 'no ••• period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable ••• unless the court sets forth ••• *its reasons* for [its] finding[s]'. Thus without on-the-record findings, there can be no exclusion under §3161(h)[7]. ••• [the Act] is *not* satisfied by••• passing reference •••" (Zedner@507); There was not even a passing reference to the public.

**Harmless error is not available**

The supreme court was clear that "Excusing the failure to make these findings as harmless error would be inconsistent with the strategy embodied in §3161(h)"(Zedner@509); Thus whether or not the public interest is deemed *post hoc* to have been outweighed is moot. See also ID@508("The government

suggests that this ••• technical failure to make an express finding may be regarded as harmless. •••The argument that the district court's failure to make the prescribed findings may be excused as harmless error is hard to square with the Act's categorical terms"). ↳ *Claim 2, Deletion of specific intent* Title 18 § 2251(a) makes it criminal or any person to cause "any minor to engage in ··· any sexually explicit conduct for the purpose of producing any visual depiction of such conduct". (ID). The specific intent element is the single most important element of § 2251(a). This is so because Congress has dictated that the state-of-mind between knowingly producing an image and having the specific intent to do so is important enough to impose a 15 year mandatory minimum for the latter. Compare § 1466A(a)(2), with § 2251(a), respectively. Furthermore, each action, engaging in sex acts with minors and producing images of minors engaged in such acts, are each separately criminalized by different statutes.

The foundational engagement in sex acts with a minor is criminalized by § 2243(a), and the knowing production of images of such conduct is criminalized by § 1466(a)(2). "Put most simply, [§ 2251(a)] requires the government to prove that creating a visual depiction was '*the* purpose' of an accused for engaging in sexual conduct", which is instead covered by § 1466(a)(2). "[A]ny interpretation of § 2251(a) must give full effect to the specific intent element. A purpose that arises at any time would include the moment of the visual capture itself and *erase* the specific intent mandate from the statute" (*US v McCauley, 983 F.3d 690 @695, 697 (CA4 2021)*).

This nuance in state-of-mind is often described in other laws, like murder and burglary, as "first degree" and "second degree". First degree production, as detailed above, requires some level of premeditation. Like a planned heist or plotted murder, § 2251(a)'s "for the purpose of" element is ancillary –it comes first. As a matter of common sense and plain wording, purpose must come before the sexual conduct, not during or after; it antedates any sex acts. Put simply, the specific-intent element requires that sexual conduct would not occur but-for the specific intention to photograph it.

Similarly, like an opportunistic theft, killing in the heat of passion, or any other crime of opportunity, second degree production merely requires that the act be done knowingly. If sexually explicit conduct is going to occur either way, it cannot be said that the purpose of the sex was to photograph it. Consider vacation photos, or for that matter a newlywed couple's honeymoon; if the wife seeks to memorialize that specific night, it cannot be said that the couple "engaged in sexually explicit conduct for the purpose of producing a[] visual depiction" –rather the purpose of the sex was to consummate their marriage. The wife still knowingly took a photograph, and is thus guilty of second degree production under § 1466A(a)(2). The same is true for "the thousands of similar photos taken every day by 17-year-old college students engaged in intimate consensual relationships". *US v Laursen, 847 F.3d 1026 @1036 (CA9 2017)*. We must exercise extreme caution and pay very close attention to the level of criminal culpability that Congress has assigned to these two statutes, else we send an entire nation's sexually active youth to federal penitentiaries for approximately the same amount of time they have been alive, simply because a picture was taken. Purpose is paramount.

### Claim WAERGTHDMGFBVD. Counsel is ineffective for not raising a lesser included offence argument

§ 1466 is a lesser included offense of § 2251(a)

#### Overview of facts underlying Claims Q-R

The required state-of-mind element of "with the intent that such minor engage in", as found in the statute, is missing from the face of the indictment. See 18 § 2251(a) ("Any person who [causes] any minor to engage in, *with the intent that such minor engage in*, ..."). See also Exhibit xkjhg (subsection verbatim in an easy to visualize form of a chart). Inextricably intertwined are both the Grand Jury clause

and 5th Amendment rights to have *every* element of an offense returned by Grand Jury and found beyond a reasonable doubt by Petit Jury. Counsel never moved to dismiss the indictment on these grounds, despite awareness of this issue a few weeks before sentencing (See Exhibits xhgdrf).

**Prejudice**

"This court has held that, in general, failure to submit an essential element of a criminal offense to the jury for determination cannot be harmless. it is necessarily prejudicial"(Waldemer v US, 106 F.3d 729 @732 CA7 1996).

As a result: 1) the government was not forced to reindict, which then-AUSA DeCarlo, might not have done. 2) Fredrickson could not avail himself of the protection of a properly instructed Grand Jury, who might not have returned an indictment. 3) the prosecution's burden of proving an entire element beyond a reasonable doubt was eliminated. 4) it was far easier for the Petit Jury to convict. 5) sans-element, the violation amounted to a strict-liability offense. 6) the delay of re-indictment could not be argued in support of a motion to dismiss on either Speedy Trial Act grounds or the Sixth Amendment right to a speedy trial.

Claim Q. Fredrickson was denied the fundamental right to a grand jury charging each element (left bold)

Counsel's failure to realize an element was missing, when faced with a simple and single-page/single-count indictment, was objectively unreasonable. Alternatively, it was objectively unreasonable for counsel to not even attempt to file a motion based thereon when it was brought to counsel's attention. Allowing the indictment to stand cannot be characterized as a strategic choice. As the Supreme Court reaffirmed just last term in Rehaif, a state-of-mind term is not trivial and a missing element is so fundamental that, "when [] an indictment fails to allege all elements of an offense, the defect may be raised by the court sua sponte"(US v Spinner, 180 F.3d 514 @516 CA3 1999). The Supreme Court has recognized that "some constitutional errors require reversal without regard to the evidence in the particular case [because they] necessarily render a trial fundamentally unfair"(Rose v Clark, 478 us 570 @577 (1986) overruled in part on other grounds by Brecht v Abrahamson, 507 us 619 @637 (1993) rejecting harmless error formulation of Chapman v California, 386 us 18 @24 (1993) for cases on collateral review).

**Solidifying the applicability of the intent element**

First and foremost, our circuit has spoken on the issue. See US v Miller, 829 F.3d 519 @ftn2 CA7 (2016) (emphasis in original) ("To the extent he suggests there is no intent prong in the statute as a whole, he is also incorrect. It criminalizes a person who *uses* a minor, '*with the intent that such minor engage in any* sexually explicit conduct for the purpose of producing any visual depiction of such conduct'"). Other courts have explicitly held the same. See US v Crow, 164 F.3d 229 @236 CA5 (1999) ("The statute requires proof that the *persuasion or inducement* of the minor was done so '*with the intent that such minor engage in*, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct'"). See also US v Ryan Heath, No. CR09-2003-LLR, N.D. Iowa, May-1-2009 @IV/B ("It requires proof that the *persuasion or inducement* of the minor be done '*with the intent that such minor engage in* any sexually explicit conduct for the purpose of producing any visual depiction of such conduct'"). See also US v Timothy Sims, No. 1:11-cr-37, W.D. Mich, Oct-27-2011 @III/5 ("the statute requires proof that the *employment or use* of the minor was accomplished '*with the intent such minor engage in*, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct'").

A large number of cases, following §2251(a)'s plain language, have also assumed in dicta that element applies to the "uses" category, evidenced by shortening out the "assist" and "transports" prongs when quoting §2251(a). See e.g. (US v Kemmish, 120 F.3d 937 @942 CA9 (1997), US v Christopher Lee, No. 16-3941, CA3, @II/B (July-12-2017), US v Beckman, 624 Fed.Appx. 909 @916 CA6 (2015), US v Cunningham, 607 Fed.Appx. 715 @716 CA9 (2015), US v Stringer, 739 F.3d 391 @396 CA8 (2014),

Second, to reach any other result, we would have to remove Congress' intentional placement of the comma following the list of transportation barriers, and gloss over the contrasting fact that Congress knows how to leave out a comma following a list of alternatives to make it apply exclusively to that prong (e.g. "employs, uses, persuades, induces, entices, *coerces any* minor to engage in"). To be sure, the missing element doesn't exactly roll off the tongue ("[causes] a minor to engage in with intent that such minor engage in"), but few statutes do, and something as crucial as a required state-of-mind should not be cavalierly cast aside, criminalizing otherwise innocent behavior simply because it "sounds better that way". To remove any lingering temptations to rewrite the statute, the Supreme Court has on numerous occasions held that a court "has no free-floating power 'to rescue Congress from its drafting errors'"(King v Burwell, 135 S.Ct. 2480 @2504 (2015) quoting Lamie v Trustee, 540 us 562 @542 (2004)). The court would also be going against several explicit holdings. See above e.g. Miller ("uses"), Crow and Ryan ("Persuasion or inducement"), Sims ("employment or use").

## Overview of facts underlying claims M-N

All of the property seized, was seized in February and March of 2017. In the nearly four years since, no property of any kind has been returned (intellectual, physical or otherwise), regardless of being seized via pat-down, warrant, incident to arrest, or inventory search, and regardless of whether particular property was later determined to be unlinked to any crime, and despite a formal request for the return of property. A pair of video-security-glasses was seized incident to arrest, whose video contents were later searched without a warrant. The video-security-glasses and its SD-card did not bear indicia of any criminal activity, yet were never returned. The towing and subsequent inventory search of my vehicle were both unauthorized, not only was my vehicle legally parked, but I was alternatively also able to provide for its removal (which I attempted). When my family arrived to remove the vehicle, it was already towed. The fact of towing and new location was obscured by both Moline Illinois and Davenport Iowa police departments for 2 to 3 days before being located. I parked in Iowa and it was towed to Illinois at the request of Davenport police. When independently located, the vehicle was not allowed to be released for over a week (under explicit police instruction) because officers had still not completed the inventory. The delays of inventory incurred over a week's worth of impound fees. A third phone (LGG4) was seized from behind the radio pursuant to the inventory, in addition to other unspecified property. Cumulative property unlinked to any crime includes, but is not limited to: three SamsungS3 phones, an LGG4 phone, several spare hard drives, an iPad mini, two Dell laptops, an HP laptop, video-glasses, various flash drives and letters. A digital warrant served on Google either failed to include a limited scope on dates and file types for perusal, or such restrictions were ignored by officers. Various counsels were instructed on these facts and their relevance.

### Prejudice
1) A blanket suppression would have eliminated all trial exhibits except statements, radically altering both the strategy at, and alternatively the outcome of, trial. 2) The return of property prior to trial would have facilitated the retention of choice counsel (via of the sale of that property).

### Argument
The prolonged wholesale retention of property especially that unrelated to any criminal activity is inherently unreasonable, and takes on an added dimension of unreasonableness when brought to the Government's attention. The AUSA's egregious position and strong resistance to returning that which it

cares not, is understandable when it's knowing 3-year wholesale retention is placed alongside knowledge that "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness"(Dalia v US, 441 us 238 @258 [1979]).

The touchstone of the 4th Amendment has always been reasonableness: "if the United States' legitimate interests can be satisfied even if the property is returned, *continued retention of the property would become unreasonable*\"(committee note to 1989 Amendment @30, 124 F.R.D. @428 to Rule 41), thus "while the government has a legitimate interest in maintaining control of property *relevant* to the prosecution and sentencing of a defendant until his criminal proceedings are final, it must *establish* the property seized is *actually relevant to that process*"(US v Nelson, 190 Fed.Appx. 712 @715 CA10 (2006)). The government failed to show such relevance, and shirked its burden in a conclusory statement that a warrant somehow fully satisfies that burden, belling the common sense notion that all warrants inevitability cover irrelevant property, rendering pointless Congress enactment of Rule 41's return procedure, and surplusage the quoted committee note at the beginning of this paragraph.

In contrast, I have continued to make a powerful facial showing of lacking relevance by cross-comparing the seizure list with the forfeiture list. The AUSA's willful non-answer is a flagrant disregard for the 4th Amendment, as well as the procedural due process provided by Rule 41, causing an aggrieved Fredrickson to resort to substantive due process (a civil suit, 20-cv-04039). In short, even if the objects were seized legally, the government's non-answer says nothing of its obligation to return property later determined to be *un*-linked to any crime; its willful prolonged retention was egregious enough to deserve blanket suppression of relevant seized property. Finally, having merit, ample time pretrial, and awareness of the above --it was objectively unreasonable, and not a result of strategy, for counsel to be remiss in 1) failing to argue suppression on this basis, and 2) failing to protect my right to retain counsel of choice through return of property.

### Claim N. The repeated 4th Amendment violations evidence a systemic problem worthy of the deterrence of blanket suppression.

#### Prejudice
The blanket suppression would have eliminated all exhibits.

#### Argument
This case reveals an alarming propensity for violation of 4th Amendment rights: 1) unjustified Terry frisks, 2) Dickerson explorations, 3) seizure of persons not arrested that day, 4) warrantless searches of video-glasses, 5) wholesale and prolonged retention of property, 6) false invocation of, and failure to follow, any established inventory policy, 7) failure to set or follow the temporal scope of warrants, 8) Knock and announcement, which under its own weight does not permit suppression (unless the civil remedy rationale proves unavailable) nonetheless should factor into the overall unreasonableness.

The cumulative violations presented a paradigm case for the deterrence rationale, and it cannot be considered a tactical choice to forego such a case deciding motion.

### Claim hgfds. A fatal constructive amendment occurred by including elements not covered in the indictment, and conduct that is not covered by the statute, exhibition of the anus.

#### Facts for claim hgfds
The indictment does *not* charge or allege:
1) Exhibition of the anus, nor
2) That a *depiction* was transported (as opposed to transmitted), nor
3) That *production materials* were mailed (as opposed to shipped or transported).

Instruction 16 (#149@18) [Exhibit hgfds-1] deviated from the definition statute §2256(2)(A) [Exhibit hgfds-2] in two ways:

1) Defining "sexually explicit conduct" as including *exhibition of the **anus***, however the definition statute in paragraph "*v*" did not include exhibition of the anus in 2017, but was amended *ex post facto* in 2018, two years before trial.

2) There is a significant difference between what a phrase *means* and *includes*. The instruction defined "sexually explicit conduct" using the word "*includes*", however the definition statute only uses that broadening word in paragraph "*i*", limiting it to expansions on "sexual *intercourse*", which was notably absent in the instruction. The remaining paragraphs in §2256(A)(iii-v) are *strictly qualified* by subsection "*A*", which says "'sexually explicit conduct' *means* actual or simulated [specific conduct]". The word "includes" in this particular instruction amounted to a constructive amendment regarding this particular element.".

Instruction 15 (Dkt 149@17) [Exhibit hgfds-3] fatally amended the indictment in 3 ways:

1) Added the alternative element that a depiction be *transported*.

2) Added the alternative element that production materials be *mailed*.

3) Obviated the need for any relationship with interstate commerce, by indicating that it would be enough if production materials merely crossed state lines.

## Prejudice

1) An amendment to the indictment is per se reversible error.

2) The jury was specifically encouraged to convict on conduct that 2251(a) did not criminalize in 2017, exhibition of the anus.

3) In the face of §2256's limited and specific definitions, the instruction's use of the broadening word "includes" permitted the jury to convict on any broad array of activities that are merely compatible with the phrase "sexually explicit conduct" without regard to legal and statutory limits.

4) The jury was encouraged to return a verdict upon conduct that was not charged. In short, the jury was permitted to convict without finding the various elements *actually charged*.

## Standard

"The Supreme Court has explained 'that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him'. Two related doctrines arise out of this 5th Amendment requirement: constructive amendment and variance. Both explain the differences between the government's case in the indictment and the government's case at trial. Constructive amendment occurs where the trial evidence supports, *or the jury instructions charge*, an offense not alleged in the indictment.··· Where a different crime has been proved (constructive amendment), it is error per se and the verdict must be vacated"(US v Lee, 937 F.3d 797 @II/A/1, CA7 2019 quoting Stirone v US, 361 us 212 @217 1960).

## Argument

It is objectively unreasonable to have missed so much error, and not within prevailing norms to ignore it. The instructions are rife with fatal amendments. First and foremost is a constructive amendment following a 2018 legislative amendment to §2256, the "exhibition of the anus", which was not covered by §2251(a) in 2017, and could not have been charged by a grand jury sitting in 2017. Whether construed as a means or element, the result is the same; the basis for conviction was fatally broadened via instructions, encouraging jurors to return a verdict upon conduct not included in the indictment.

Similarly, the instructions added the use of mails, which was not charged, added transportation where only transmission was alleged, and the instructions made yet further constructive amendment in enabling a verdict upon merely crossing state lines as opposed to interstate commerce. Constructive amendments are italicized in the sandwich comparisons below:

Indictment: "sexually explicit conduct"
Instruction16:"lascivious exhibition of the *anus*, genitals, or pubic area of any person"
§2256(2)(A)(v):"lascivious exhibition of the genitals, or pubic area of any person"


Indictment: "sexually explicit      conduct"
Instruction16:"sexually explicit    conduct    *includes*    actual or simulated"
§2256(2)(A)(v):"sexually explicit    conduct    means      actual or simulated"


Indictment---:"visual depictions would          be          transmitted using…"
Instruction15:"visual  depiction  was going to be *transported* or  transmitted using…"
§2251(a)------:"visual depiction  will        be transported or  transmitted using…"


Indictment----:"materials that had been        shipped and  transported in interstate commerce"
Instruction15: "materials that had been *mailed*, shipped, or  transported *across state lines*"
§2251(a)-----:"materials that had been mailed, shipped, or  transported in interstate commerce"


**Claim oljjh. The jury was not unanimous as to each of the required elements, and each juror had a different crime in mind.**

### Facts for claim oljjh

The indictment charged all 6 alternative elements of "employs, uses, persuades, induces, entices, or coerces", and 2 of the 3 alternative ways to effect commerce (6 x 2 = 12). The indictment also charged both elemental alternative types of commerce (interstate, foreign). Furthermore, underlying error aside, the indictment requires literal translation of "sexually explicit conduct" into the statutorily defined, mutually exclusive, 5 elemental alternatives to state an offense, thus charging all 5 alternatives. The jury was neither asked nor required to unanimously agree upon which elements in each set it found were satisfied. The jury was in fact instructed that it could find either of two elemental ways to effect commerce, without internally agreeing on which element(s) were satisfied (instruction 15, Dkt#149@17 point 3). Counsel was informed of, and asked to prevent the threat of, a non-unanimous jury in advance of trial (Exhibit oljjh).

### Prej

With such flexibility, each juror was free to convict by several distinct and even conflicting combinations of elements, depriving Fredrickson of the constitutional guarantee of a unanimous jury finding of each element beyond a reasonable doubt. All 12 jurors were permitted to convict with 12 different crimes in mind.

### Standard

The ACCA provides a very close analogy, and is highly instructive. see US v Trent, 767 F.3d 1046 @1060 CA10 (2014) (recognizing that "there will be occasions in which some jurors could have convicted under one of the statutory phrases while other jurors convicted under a different phrase. But the Court has not addressed that possibility and we need not predict its analysis to resolve this case"). When there are alternative elements, the jury must be unanimous as to *which* elements it found, in order to prevent the threat that each juror had a different crime in mind. See Descamps, 133 S.Ct. 2276 @2282 (2013) ("when a statute lists multiple, alternative elements, [it] effectively creates several different crimes"). See also Trent@1054 quoting ID ("In that context the prosecutor 'must generally select the relevant element from [the statute's] list of alternatives… and the jury, as the instructions in the case will make clear, must then find *that element, unanimously* and beyond a reasonable doubt'").

This is to say that if someone employed a minor by gift and money, the jurors do *not* have to be unanimous on whether the gift or money satisfied the element of "employs" (the *means* by which an

on which (or both) of the *elements* were met. In part because changing even one element transforms the crime and its implications. See e.g. Descamps @2281 (When a statute "sets out one or more *elements* of the offense in the alternative --for example, [] burglary involves entry into a building *or* an automobile").

Means v Element test, harmonizing case law
What distinguishes a "means" from an "element" can be confusing. The Supreme Court followed up Descamps with Mathis v US, 136 S.Ct. 2243 (2016), again in the ACCA context, saying it would be helpful to see how indictments and instructions are worded. See Mathis@2257 ("if those documents use a single umbrella term like 'premises'"). This is a great test, but it can be distilled and simplified further as a "specificity inquiry". The words a statute uses are presumptively elements. See Descamps ("when a statute lists multiple, alternative elements, [it] effectively creates several different crimes"). For example if the statute uses "premises", then anything more specific (building or automobile) is a means to that element's satisfaction. If a statute uses "building or automobile", then anything more specific (warehouse or semi) is a means to that element's satisfaction. If a statute uses equivalent words (shed = garage) or example-language (like "including"), then the Supreme Court's suggested documents could still be used to resolve any ambiguity or determine if a means has been elevated to the status of an element, merging with case law on being limited to charging language (in both the trial and enhancement contexts).

Argument
The charged statute §2251 and the indictment do not use a generic umbrella term like "causes", but rather uses the words "employs, uses, persuades, induces, entices, or coerces", thus anything more specific than these *elemental alternatives* is a "means". It is not necessary to examine what actions may have met any of these elements, because the challenge is to the fact that *all 6 alternatives were charged*, specifically that the jury did not indicate *unanimity as to which one(s) it found* (list below).

Similarly, the statute and indictment do not use the word "commerce" as a blanket term, but rather uses the various elemental alternatives of interstate or foreign commerce (multiplied by the two choices of being either "in" or instead "affecting" the same). The how and by what means either elements of commerce may have been met is not relevant, it is important only that the jury neither indicated nor were required to have a unanimous consensus between these two sets of alternatives.

Related to, and operating in tandem with the commerce elements above, are the further elements that something be found to have been *transported* or *transmitted*. Again the means (how and what) something was transmitted or transported is not the operative inquiry here, but rather the fact that the jury again failed to connote which of the two (or both) elements was satisfied.

Next is the train wreck. While the indictment uses the blanket term "sexually explicit conduct", the statute further defines the term as *meaning* (crucially, not merely "including") 6 different alternatives (masturbation and exhibition of the pubic area, among others). In the end, not only was there no instruction to indicate that harmony was required, neither the record nor verdict convey any hint that one of the jurors did not convict on this improper basis. Charge not included in the indictment is per we reversible error

Similar to and simpler than the above, the statute uses the word "producing", which is defined to mean *exactly* 5 different things, but the instructions defined the 5 elemental alternatives with the caveat "including", not just implying but *instructing* that "producing" can mean something more or different. The error is three-fold.
1) the word "including" essentially nixed this element's status as an element, allowing substitution.
2) the jury thus failed to show that producing (or one of the *valid* alternatives) was found.
3) the jury again failed to convey which (if any) of the alternatives it found unanimously.

Just like a generic unanimity that burglary occurred would not be enough to blot out the two specific elements of whether it was building or car, neither can a generic unanimity overcome the required unanimous consensus between the 6 alternative elements of "employs, uses, persuades, induces, entices, or coerces", and there is yet more lacking unanimity. Evincing an egregious dereliction of juror duty, second only to court and counsel's is yet more lacking unanimity, allowing the following (non-exhaustive) legal combinations:

employ + *produced* using materials + from *foreign* commerce
uses + *transmitted* using materials + from *interstate* commerce
*employs* + depiction was transported + in *interstate* commerce
*induces* + depiction will be trans*mitt*ed + in *foreign* commerce
*entices* + depiction will be trans*ported* + in *foreign* commerce

For the sake of brevity, the other alternative elements, and those that compose each commerce prong are not reflected above, i.e. we cannot be sure if the jury (regardless of underlying facts) was unanimous in its finding of elements between the two alternatives of "in or affecting [commerce]", nor whether the jurors were *further* unanimous between either "interstate or foreign commerce" (6x2x2x2=48 combinations). Similarly, to prevent an unwieldy verbose assault on the court, the further 6 *mandatory* inserts for "sexually explicit conduct" (strict *exclusive* definitions in §2256(2)(A)(i-iv)), is omitted here (46x6 brings the total to 288 possible combinations of "charged" elements). The point is, the jurors were free to convict on any of over 288 completely different theories, with no requirement that two (much less all 12) jurors be unanimous as to at least path of guilt.

In short there is no indication the jurors were of one unitary mind in returning a purported unanimous conviction of a single crime as the constitution requires, as opposed to 12 different crimes when saying "yes".

### Overview of claims omqhdj and mqofg

The act of making a copy, or *r*eproduction, is not production within the meaning of Section 2251. The government's evidence consisted entirely of the *Alice-produced* depiction being transmitted across state lines *by Alice*. In short, Fredrickson was charged with the wrong crime, and the government's argument at trial might support receipt or possession, but not production.

In the alternative, if *r*eproduction is production within the meaning of §2251, than any *r*eproduction by Fredrickson is a separate act, distinct from Alice's original act of production, and Fredrickson's later act lacks the required nexus to commerce. After Alice's act of transmission, there was no evidence presented that any reproduced *image* moved through commerce or that such reproduction occurred via an *object* that had moved in commerce.

### Claim omqhdj. Reproduction is not production within the meaning of Section 2251.

#### Prejudice

Fredrickson is factually and legally innocent of production, the wrongfully obtained conviction carries mandatory incarceration of 15 years, which is three times the mandatory minimum of possession.

A defendant must have directly produced an image that moved through commence, not merely aided and abetted another to (self) produce a depiction which moved through commence. In other words, which act of production resulted in a depiction that moved through commence?

**Claim mqofg. There was no evidence to support the required nexus between the distinct act of *reproduction* and commerce.**

**Prejudice**

**Argument**

### Overview of claims 1xsewt and 2qpfxj

The jury verdict lacks unanimity in two related but legally distinct ways, either or which alone require reversal. First, there were various alternative elements that the jurors were not required to choose between, which is similar to duplicity in that the indictment (like the divisible statute it is based on),authorized different crimes due to the statute's divisibility (the element-based approach). There was no unanimity as to any of one or more elemental alternatives, which is even more serious than a simple divergent theory of guilt, in that no single element had unanimous Consensus. Phrased differently, the indictment actually charged several distinct crimes proscribed by §2251, and the jury was not required to choose one with unanimity. Second, and as an alternative argument, in a few instances, a *single* element could be satisfied by various conceptually distinct theories, each predicated on different facts (the theory-based approach), In violation of the Fifth Amendment as interpreted by the Supreme Court in *Schad* first one is more serious, in that alternate elements necessarily include different facts.

**Claim 1xsewt. The jurors did not unanimously agree which elemental alternatives were met**

**Facts**

1) When confronted with alternate elements, the jurors were neither told nor required to be unanimous as to one or more.

2) The indictment included at least 5 such instances or sets of alternate elements as set out more fully below.

3) Trial Judge Mihm recognized one such set, and raised the issue sua sponte. See Trial Trans 123:10-13 ("okay. I made a note here, ⋯ it does talk about this in the alternative, doesn't it? Interstate *or* foreign commerce?").

4) In another instance, the jury was affirmatively instructed that it was permissible to lack unanimity between two especially distinct provisions (See Exhibit 1xsewt-1).

5) Counsel was informed of, and asked to prevent the threat of, a non-unanimous jury in advance of trial. It was not a strategic decision to allow non-unanimity.

3) Before delving too far into either claim, the Supreme Court has spoken on one of the issues raised. In *Massachusetts v Oakes, 491 us 576 @580 (1989)*, the Supreme Court noted the problematic disjunctively in a verdict under an analog State statute utilizing nearly all of the same operative verbs as the Federal statute at issue here. See ID@580 ("its verdict rested on a finding that Oakes 'hired, coerced, solicited, or enticed, employed, procured, used, caused, encouraged, or knowingly permitted' L.S. to 'pose or be exhibited in a state of nudity'. The acts proscribed by §29A are listed disjunctively, so it is impossible to ascertain which of those acts the jury concluded Oakes had committed"). It is likewise impossible to tell *which*, or *if any*, of the acts individually had the required unanimity between "employ, use, persuade, induce, entice, or coerce"(R.13).

**Prejudice**

Where there are over 288 available permutations of elements, the prejudice is clear: A case where only one juror takes any given path down the element tree, is an acquittal by anyone's definition. With such flexibility, each juror was free to convict with even conflicting elements, depriving Fredrickson of the constitutional guarantee of a unanimous jury finding of each element beyond a reasonable doubt. All 12 jurors were permitted to convict with 12 different crimes in mind. Starting at 100% and dividing by the number of choices (alternate elements) at each juncture, ignoring alternatives not charged, and ignoring constructive amendments, there is less than 1.0416% chance of juror unanimity.

## Standard
"Specific unanimity instructions, as distinct from a general instruction that the jury must unanimously find the defendant guilty beyond a reasonable doubt in order to convict···, are necessary only when there is a significant risk that the jury would retain a guilty verdict even if there were less than unanimity with regard to one or more elements of the crime"(US v Schiro, 679 F.3d 521 @533 CA7 2012). On the other hand, alternative elements, as opposed to the means that satisfy an element, per se require unanimity.

## The Analytic Framework for requiring unanimity
"In Schad v Arizona, 501 us 624 (1991), a four-justice plurality concluded that when a statute enumerates alternative routes for a violation, whether jurors must be unanimous with respect to a particular route depends on two questions. First, did the legislature intend the different routes to establish separate 'offenses', for which unanimity is required as to every fact constituting the offense, or different 'means' of violating a single offense, for which unanimity is not required? Second, if the legislature intended the alternative routes to be mere means of violating a single statute, is the statute's definition of the crime unconstitutional under the Due Process Clause?"(US v Edmonds, 80 F.3d 810 @815 CA3 1995 applying test to CCE). See also Descamps v US, 570 us 254 (2013) ("when a statute lists multiple, alternative elements, [it] effectively creates several different crimes"). See also Mathis v U S, 136 S.Ct. 2243 @2249 (2016) ("A single statute may list elements in the alternative, and thereby define multiple crimes"). See e.g. US v Oliver, 955 F.3d 887 @891 CA11 (2020) quoting Descamps@264 ("For example, a divisible statute might state that 'burglary involves entry into a building *or* an automobile'").

In short, if the alternative term is an element then the inquiry is at an end and *specific* unanimity is required as to the one or more alternates, but if the term is a "means" then it still must pass Due Process scrutiny. In Schad, the plurality concluded --and Justice Scalia seemed to agree-- that Due Process limits the legislature's "capacity to define different courses of conduct···as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which course···actually occurred"(plurality@632, Scalia@650-2). This right has been classified as fundamental. See 1D@632-3 ("it is an assumption of our system of criminal justice 'so rooted in the traditions and conscious of our people as to be ranked as fundamental', that no person may be punished criminally save upon proof of some *specific* illegal conduct"). The Supreme Court most recently applied this test in Richardson[@818] holding that the phrase "series of violations" [in the CCE, 21§848(c)(2)] creates "several elements, namely the several 'violations', in respect to *each* of which the jury must agree unanimously and separately".

### Supreme Court directives on element status
A term's status as an element is therefore a crucial component, and the Supreme Court offers several ways to make the distinction between elements or means. ACCA case law is instructive. See Mathis ("Distinguishing between elements and facts is therefore central to ACCA's operation"). The divisibility aspect of ACCA case law is particularly on point here. See Mathis@2249 ("A single statute may list elements in the alternative, and thereby define multiple crimes").

## Elements outright

Regarding the first question, Mathis provides a toolbox of tests to determine where a term falls in the element/means dichotomy:

*1)* If either an indictment or instruction selected that term out of a list, it is an element. See Mathis@2257 ("Conversely, an indictment and jury instructions could indicate, by referencing one alternative term to the exclusion of all others that the statute contains a list of elements, *each one* of which goes toward a *separate* crime"). See e.g. US v Grundy, 842 F.3d 1156 @1167 CA11 2016 ("whether the place burgled was a dwelling, building, railroad car, vehicle, or watercraft --is the hallmark of a divisible statute").

*2)* A term is a means if it is meant to be an example of the preceding element. This will be very clear through the use of particular terminology ("or other", "other means", "including", "any", "by", "such as"). See Mathis@2257 ("if a statutory list is drafted to offer 'illustrative examples', then it includes only a crime's means of commission"). See e.g. US v Mickey, 897 F.3d 1173 @1181 CA9 2018 ("The word 'means' appears twice in the relevant statutory text"). See also ID@1182 (key word "by" signifies means).

### Elevating a Means to Element status

Regarding the second question, the Supreme Court has recognized various due process limits on alternate means. There is a "point at which differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the constitution requires to be treated as separate offenses"(Paredes v Thaler, 617 F.3d 315 @323 CA5 2010 quoting Schad@633). See also Richardson@820 ("Finally, this court has indicated that the Constitution itself limits [legislative] power to define crimes in ways that would permit juries to convict while disagreeing about means"). The most widely known is

*1)* if a "brute fact" or means increases punishment, it is elevated to the status of an Apprendi element. See Mathis@2256 ("If statutory alternatives carry different punishments, then under Apprendi they must be elements").

*2)* The term(s) must be fundamentally fair. See Schad@637

  (Considering "history and wide practice as guides to fundamental values"). This
  test played a central role in Richardson wherein the Supreme Court held that the
  phrase "series of violations" created sub-elements (each violation). See e.g.
  ID@818-9, 817-8 (Recognizing that "To hold that each 'violation' here amounts to
  a separate element is consistent with a tradition of requiring juror unanimity where
  the issue is whether a defendant has engaged in conduct that violates the law. To
  hold the contrary is not" when deciding whether the "phrase 'series of violations'
  refers to one element, namely a 'series', in respect to which the 'violations'
  constitute the underlying brute facts or means, or whether those words create
  several elements, namely the several 'violations', in respect to *each* of which the
  jury must agree unanimously and separately").

*3)* Alternate means must have "moral and practical equivalence"(Edmonds@816 quoting Schad@637). See also IDs (The Schad test "is a check on the legislature's power: its purpose is to decide whether different routes of violating the same statute are so morally disparate that a legislature cannot constitutionally treat them as mere means"). In other words, for a means to pass the Schad test and permit non-unanimity, the alternative means "must reflect notions of 'equivalent blameworthiness or culpability'"(Edmonds@820 quoting Schad@643). As an example, though not a model of clarity, the Schad court [@634] acknowledged the progeny of US v Gipson, 553 F.2d 453 CA5 (1977) which solved its problem by creating umbrella categories (noting "The fifth circuit reversed, reasoning that the defendant's right to 'jury consensus as to his course of action' was violated by the joinder in a single count of 'two distinct conceptual groupings', receiving, concealing, and storing forming the first grouping (referred to by the court as 'housing'), and bartering, selling, and disposing ('marketing') constituting the second").

### Argument

As Mathis explained, "'Elements' are the 'constituent parts' of a crime's legal definition, the things the 'prosecution must prove to sustain a conviction'. At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant. ··· Facts, by contrast, are mere real-world things —extraneous to the crime's legal requirements. We have sometimes called them 'brute facts' when distinguishing them from elements"(Mathis@2248). The Supreme Court put a forceful distinction between elements and facts. See ID (Facts "are 'circumstances' or 'events' having no 'legal effect or consequence': in particular, they need neither be found by a jury nor admitted by a defendant"). See e.g. US v Hewlett, No. 20-cr-64, E.D.Va., June-16-2020 ("Count 1 identifies···the means by which the offense was committed, namely 'a video file depicting Hewlett engaging in sexual intercourse with Minor girl 1, produced using Apple iPhone'"). See also US v Kearn, 863 F.3d 1299 @1310 CA10 2017 ("Different images are merely different means of satisfying the element [of 'any visual depiction']").

Each of the terms below must be elements, because each is a "constituent part" of §2251, that cannot be omitted without failing to state an offense, and must be found by each juror. To illustrate this point, consider the element of inducement, which must be alleged, and admitted or proven, but not the particulars on how the inducing occurred -such as by 3 shots of tequila. Further juxtaposing elements with their means, the transportation of any image must be alleged and admitted or proven, but not which image or how it was transported -such as the nature-pin-up one by train. That a production material was shipped must be admitted or proven, but not whether it was a camera or bed sheet, or the means of shipping -such as Egyptian cotton through FedEx. That it was interstate commerce, but not which state it came from or the channel -such as Arizona by rail. This claim exclusively involves elements, and challenges the various junctions where the jury was not required to be unanimous between one or more: (induces or entices or coerces or employs), (shipped or transported or transmitted), (*depiction* or *production material* moved in commerce), (effect on either *interstate* or *foreign* commerce). For the sake of brevity, only five of the hundreds of permutations include:
employs + *produced* using materials + from *foreign* commerce
employs + *transmitted* using *materials* + from *interstate* commerce
entices + *depiction* was transported + in *foreign* commerce
*uses* + depiction *will be* transported + in *interstate* commerce
*induces* + depiction will be trans*mitted* + in interstate commerce

**Set 1**
In the phrase "employs, uses, persuades, induces, entices, or coerces any minor to engage", the first six terms are elements for seven reasons:
1) A means satisfying only *induces,* would be drugging a seventeen year old.
2) A means satisfying only *coerces,* would be any kind of demand, thus each element criminalizes different "brute facts". In the words of Blockburger, each term requires proof of a fact that the other does not.
3) Some of these elements conflict, e.g. entice vs coerce.
4) To reduce these elements to mere means begs the question "to the satisfaction of what element?", If they are a means to satisfy a "causation" element, we have done three things:
A) read-in the word "causes" that the legislature did not place there. eg Oakes ("hired, coerced, solicited, or enticed, employed, procured, used, <u>caused</u>, encouraged, or knowingly permitted").
B) Broadened that element (and criminal scope) to cover any kind of causation.
C) Ignored that the word "uses" does not fit within "causes", (i.e. would voyeurism count? A voyeur does not cause anyone to do anything). Far from "having no legal effect or consequence", each term is a different element, each *criminalizing* different "brute facts" or means. See Mathis@2249. See e.g. US v Grundy, 842 F.3d 1156 @1167 CA11 2016 ("whether the place burgled was a dwelling, building, railroad car, vehicle, or watercraft --is the hallmark of a divisible statute"). 5) Others' indictments have tellingly, and appropriately, selected the applicable element(s). See Mathis@2257("an indictment···could indicate, by referencing one alternative term to the exclusion of all others that the statute contains a list of elements, each one of which goes toward a separate crime"). See e.g. US v John Kapenekas,

In the alternative, the terms "entice" and "coerce" don't reflect "equivalent blameworthiness or culpability" and thus must be divided and brought to individual unanimity to satisfy the Schad Due Process test.

5) If these terms are not elements, then several courts' assessment of elements under Blockburger would be drawn into question. See e.g. US v Isabella, 918 F.3d 816 @848 CA10 (2019) ("Because §2422(b) does not include the words 'employs' or 'uses', this element of §2251(a) is broader than the corresponding element in §2422(b), and therefore the former cannot be a lesser included offense of the latter"), or would otherwise expose a flawed Blockburger analysis (i.e. if employs/uses are simply illustrative means, then the comparative element they satisfy was the same after all). 6) Each alternative element has its own unique defense (e.g. coerce vs consent, persuade vs predisposition, induce vs already occurring, et. al. vs any antonym). 7) Any aggregation combines the criminality of each term, while simultaneously eliminating the defense each term would otherwise have on its own. Thus, even if not elements, they must be treated as such, requiring specific unanimity under the Schad "fundamental fairness" test. To be sure, the government may conjunctively *charge* alternative elements, a common strategy, but let a man be found guilty for what he did, and innocent of which he did not, namely by the constitutional guarantee of a jury unanimously finding each element beyond a reasonable doubt. Like in Oakes [@580], because the jury's "verdict rested on a finding that [defendant] coerced, enticed, employed, [or] used [her] The acts proscribed by [statute] are listed disjunctively, so it is impossible to ascertain which of those acts the jury concluded [he] had committed".


### Set 2

In the phrase "such visual depiction will be transported or transmitted", the terms *transported* and *transmitted* are alternative elements for four reasons: 1) a means satisfying only *transported,* would be hand delivering a depiction. 2) Each criminalize a set of "brute facts" that the other does not (e.g. emailing a depiction vs physically moving a depiction). 3) The indictment charged *transmitted to the exclusion of transported*, a decision the Supreme Court deems significant. See Mathis@2257("Conversely, an indictment [] could indicate, *by referencing one alternative term to the exclusion of all others*, that the statute contains a list of elements, *each one* of which goes toward a *separate* crime"). 4) The element *transported*: a) appears at various locations elsewhere in the statute, where it is b) often juxtaposed as an alternative to yet other elements, e.g. *mailed*, and in such location, as claim mkjvd pointed out, was c) actually charged to the exclusion of *mailed.*


### Set 3

In the phrase "produced or [live-] transmitted using materials that have been mailed, shipped, or transported", the terms *mailed* and *shipped* and *transported* are alternative elements for four reasons: 1) A means satisfying *only* transported, would be bringing a camera on vacation, thus each criminalizes a different set of "brute facts" that the other does not. 2) The indictment charged both *shipped* and *transported* to the exclusion of *mailed*, a choice the Supreme Court deems significant. See Mathis@2257 above. 3) These elements are actually followed by an example means, explicitly demarcated as such ("by any means, including by computer"), i.e. transported by means of computer, thus the statute is dispositively clear in this regard. Even if the statute were not clear, the Supreme Court is. See Mathis@2257 ("if a statutory list is drafted to offer 'illustrative examples', then it includes only a crime's means of commission"). This persuasively indicates the other terms are elements. 4) At least one court has recognized these as individual elements. See US v Zimmerman, 529 F.Supp.2d 778 @791 S.D.Tex, Dec-20-2007 (addressing these elements in an identically worded jurisdictional hook provision, stating "it is well established that a disjunctive statute may be pled conjunctively, but proved disjunctively").


### Set 4

Relatedly, the terms *interstate* and *foreign* commerce are alternative elements for five reasons: First and foremost, Trial Judge Mihm recognized them as requiring specific unanimity. See Trial Trans 123:10-13

("okay. I made a note here, ⋯ it does talk about this in the alternative, doesn't it? Interstate *or* foreign commerce?").
1) a means satisfying only *interstate* commerce, would be buying a commodity manufactured in a neighboring state.
2) Each criminalizes a different set of "brute facts" that the other does not (e.g. selling something in the next state VS ordering product from China).
3) Such a finding between elemental dichotomies is especially compelling, given that the *crux* of a commerce crime is that commerce was affected, and that there are two distinct types of commerce. The need to make a choice is only underscored by its constitutional grant of authority. Article I, Section 8 of the Constitution *itself* did not state means, but two types of commerce that may be regulated.
4) Other Supreme Court Constitutional holdings support this requirement. See Richardson@818-9 (recognizing that "To hold that each 'violation' here amounts to a separate element is consistent with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law. To hold the contrary is not").

## Set 5
The phrase "sexually explicit conduct" is not an element itself, but rather a stand-in for 5 specifically defined alternate elements. *Sexual intercourse* and *bestiality* and *masturbation* and *sadistic/masochistic abuse* and *lascivious exhibition of [three things]*. Those terms, listed in §2256(2)(A), are elements for eight reasons:
1) A means satisfying *only* lascivious exhibition of the pubic area, is a natural-pose pinup.
2) A means meeting *only* sadistic abuse, would be an infliction of physical pain upon a fully clothed person -- thus each alternative criminalizes a different set of "brute facts" that the other does not.
3) One of these elements actually includes illustrative means that would satisfy the uncharged element of "sexual *intercourse*. See §2256(2)(A)(i) (enumerating element and then listing means that qualify "sexual intercourse, including genital-genital, oral-genital, anal-genital, ⋯ whether between persons of the same or opposite sex"). See also Mathis@2257 ("if a statutory list is drafted to offer 'illustrative examples', then it includes only a crime's means of commission").
4) The *instructions* included *masturbation* and *lascivious exhibition of [three things]* to the exclusion of *sexual intercourse* and *bestiality* and *sadomasochistic abuse*. See Exhibit 1xsewt-2, instruction 16. See also Mathis@2257 ("*jury instructions* could indicate, by referencing one alternative term to the exclusion of all others that the statute contains a list of elements, each one of which goes toward a separate crime"). Relatedly, other people's indictment's have in/excluded a few of the various alternatives.
5) Recognizant of Ferber's warning that the class "of 'sexual conduct' proscribed must [] be suitability limited and described"(ID@764), Congress went well out of its way to specify these terms in a particularly disjunctive manner, moreover in single-word clauses. If "sexually explicit conduct" were not a mere stand-in, the term would have no realistic limit, contravening Ferber. There is a world of difference between what something means as opposed to includes. See e.g. Energy v Socap, 832 F.2d 997 @1003 CA7 (1987) ("By using 'means' instead of 'includes' in §547(a)(2), congress created *an exclusive*, rather than an open-ended, definition for new valve"). Shell v EPA, 950 F.2d 741 @753 D.C.App (1991) ("The statutory definition states what 'treatment' means, as opposed to what it includes"). Baptist v Huffman, 712 F.2d 206 @210 CA5 (1983) ("By using the word 'means' rather than 'includes', Congress enacted a *precise and restricted* definition").
6) One, exactly one, of these stand-in elements, sexual intercourse, *itself* includes various example means. Thus if sexual intercourse were to be a means, we would have an example means *with* an example means *of* that example means.
7) A further statutory clue in §2256(3) supports the required stand-in. Compare Helvering v Morgan's, 293 us121 @126 ftn1 (1934) (describing a statute that introduced three definitions with the word "includes" and seven definitions with the word "means" and noting that "the natural distinction would be that where 'means' is employed, the term and its definition are to be interchangeable equivalents") with §2256(3) ("*producing means producing*, [and 5 alternates]"). Because the definition statute does not in

like manner say "sexually explicit conduct means sexually explicit conduct and etc.", the phrase is merely a stand-in for the enumerated elements, from which the jury must select and bring (one or more) to unanimity.

8) Even if means, they should be treated as elements under Schad because inducing exhibitionism is the least culpable of the alternates (§2G2.1(b)(2)), while sadistic/masochistic abuse is the most blameworthy (2G2.1(b)(4) and 2G2.2(b)(4))

The point is that the jurors were free to convict on any of over 288 completely different permutations of elements, with no requirement that two (much less all 12) jurors be unanimous as to at least one path of guilt. To be sure, statutory redundancies are common and make it possible for conduct or a particular fact to satisfy two alternate elements (or two statutes for that matter), but any judicial effort to hold that an underlying fact, *in fact* is a means that satisfies both elements, and thereby attempt to embrace some form of harmless error, would implicate serious 6th Amendment concerns, as only the jury can decide what facts satisfy an element. See Mathis@2252 ("and so too [the court] is barred from making a disputed determination about [] 'what the jury in a prior trial must have accepted as the theory of the crime'").

### Claim 2qpfxj. Each juror returned a verdict with a distinctly different theory in mind for each element, such that due process was violated by the lacking unanimity

**Facts**
The indictment did not give notice of facts or means, which would thereby have limited the available theories to revolve around particular objects or types of commerce. The jurors, by instructions or otherwise, were not required to agree on any of the following means: 1) which of two people produced a depiction, 2) which of four objects might have done the producing, 3) if it was a depiction -who moved it and how, or instead 4) which of any of the four production objects moved in commerce, and who so moved it, 5) by what means did that person cause movement to occur in either foreign or instead interstate commerce. (See attached chart, (Exhibit 2qpfxj-1).

**Prejudice**
The availability of at least 12 possible theories allowed each juror to convict on composite guilt, rather than juror unanimity, all in violation of the fifth and sixth amendment. An instruction that permits the jury to return a guilty verdict where all jurors agree that he is guilty of *something* is not sufficient. In this case: 1) Eight jurors split into two groups, one finding Alice was the producer, the other Fredrickson was the producer. 2) Fredrickson and Alice each had two objects. In the *Alice* group, two jurors found that her [S7]phone and the other two that her iPad was the producing object. In the *Fredrickson* group, two jurors decided that his [G5]phone, and the other two that his computer was the producing object. 3) From those four groups of two, those eight jurors further diverged, each finding that the object moved in the other type of commerce, in now eight distinct theories of guilt. 4) Those eight jurors aside, the four holdout jurors instead found a depiction as the basis of conviction. Those four remaining jurors likewise were split between the four theories that: 5) a depiction traveled by internet across state lines, 6) by internet but at all times within the same state and later moved across state lines by foot, 7) no depiction actually moved and instead the defendant thought it would, 8) a depiction moved over an ad hoc (direct device to device) connection without the internet.
It was objectively unreasonable for counsel not to request a bill of particulars (to narrow the charge and circumscribe argument) or in the alternative request a specific unanimity instruction for the jury based on the Schad due process test.

**Argument**
When multiple theories are advanced, the government must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury. it cannot rely on a composite theory of guilt, producing twelve jurors who thought the defendant was guilty but who were not unanimous in their assessment of which act supported the verdict. See US v North, 910 F.2d 843 @876 D.C.App 1990 ("A

further safeguard in the form of a particularized instruction is required [] in the face of 'a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts"). A reviewing court "must be certain that the jury was properly instructed to achieve" the required unanimity(US v Beros, 833 F.2d 455 @462 CA3 1987). See North@878 ("Because 'the permutations that can support a valid conviction are varied and several', the possibility that the jury did not reach a verdict of specific unanimity is significant and real").

First and foremost, the indictment charged two distinct theories: (depiction would be) vs (object was). The instructions highlighted the distinct theories, without requiring specific unanimity. See Exhibit 1xsewt-1. See also US v Reinhart, 357 F.3d 521 @527 CA5 2004 (government charged "two kinds of §2251(a) violations --one covering the situation when the defendant has *knowledge* at the time the visual depiction is created that it *would be transported* across state lines. The other covering the situation when the defendant *has no such knowledge* at the time the depiction is created but thereafter *actually transports* the visual depiction across state lines"). See also US v Buculei, 262 F.3d 322 @ft6 CA4 2001 ("alternative jurisdictional hook spelled out in §2251(a), i.e. that the *materials used for* the visual depiction were transported in interstate commerce"). That each distinct provision itself contains a distinct group of elements only bolsters the need for specific unanimity. See e.g. North ("the jury had three alternative theories of destroying, altering, or removing on which it might have convicted North under §2071(b)").

The permutations set out in the fact and prejudice headings bears no need repeating or further expanding. "Where several factual predicates support a guilty verdict, a defendant is entitled to unanimous agreement among the jury as to which of those 'alternative factual predicates' provided a basis for conviction"

US v Arthur Kniffley, No. 15-cr-00095, W.D.Kentucky, Nov-14-2016 ("For example, one of the elements the US must prove ··· among other alternatives").

### Claim kfso. In giving the Allen charge, the trial court contravened the required form prescribed in Silvern.

**Facts**
The Allen charge given in instruction 27 (R. 149 @29). Exhibit kfso-1. Differed in form from the seventh circuit's prescription (quoted below).

**Prejudice**
Failure of appellate counsel to take a free ticket to an instant and per se reversal, cannot be a reasoned decision, and is objectively unreasonable. Failure to use this ticket as a gateway to argue the many claims in this petition, or the many benefits that a new trial entails before a new jury, is the prejudice suffered.

**Argument**
The instruction had to be given. See US v Sblendorio, 830 F.2d 1382 @1387 CA7 (1987) ("Silvern prescribed an instruction, which may be given to a hung jury *only if given during the initial charge too*").

The seventh circuit forcefully warned, *twice*, that "'If in any trial tried after thirty (30) days from this opinion [gives] a supplemental instruction relating to a deadlock is given other than in the above form, a resulting conviction *will be reversed* and remanded for a new trial.' For 14 years the court has reversed *every* conviction in which a deadlock instruction other than the Silvern instruction was given"(Sblendoria@1387 quoting Silvern@883). The irony is that the instruction actually cited Silvern.

Failure to follow the dictated form is reversible error *regardless* of prejudice or violation of constitutional rights. See Silvern@884 ("the majority of this court is really not too disturbed either because the charge was held not to violate the defendant's constitutional rights and not to be prejudicial. Nevertheless, apparently writing section one of a manual of instructions, the court states that deviation from the precise language of that instruction in the deadlocked jury situation is reversible error").

The prescribed Silvern form is:

> "The verdict must represent the considered judgement of each juror. In order to return a verdict, it is necessary that each juror thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgement. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
>
> You are not partisans. You are judges-judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

## Claim qmrhf. The search-warrant was executed long before the judge authorized it. A warrantless search occurred

(Exhibit qmrhf-1)
The search-warrant was authorized at 11:19am (Exhibit qmrhf-2)
I remember the search occurring at 10am, just before i was about to leave for work.
The police performed a search and seizure without a warrant, over an hour before any application was sworn in front of Iowa judge Clayton. The item seizure sheet was signed and dated at the conclusion of the search at 11:14am, five minutes before Iowa Judge Clayton granted and signed the search-warrant.

### Prejudice
All exhibits would have been suppressed as the result of a warrantless search in violation of the fourth amendment. The ability to appeal was circumscribed.
It is always objectively unreasonable, and can never be the result of a strategic or reasoned decision, to forego a meritorious motion to suppress. Search warrants are the "go to" in any case, and usually the first thing examined. Perhaps an explanation can be found in decedent counsel's declining health and chemotherapy inspired burdened mental faculties'.

### Argument
none yet, its self-explanatory

### Facts
According to official documents:
The search-warrant had concluded at 11:14am

## Claim aksjd. The knock and announce violation became a suppressible ground after two years without a criminal trial

### Facts

The two year statute of limitations for a civil remedy expired a year before Fredrickson's criminal trial, leaving no deterrent mechanism available except for suppression of any evidence. Counsel did not motion for suppression. At no point did any of the 12 officers announce identity or authority or purpose before entering the apartment. An officer knocked on the door with a single three-burst knock. Fredrickson, seated 2 feet away, responded to the knock in less than 5 seconds. As the latch released on the door, it flung open forcefully due to the pressure applied to the door from the outside by the officers, and with guns drawn, they immediately swarmed all rooms of the apartment without attempting to attain assent or voluntary compliance with any purported warrant. The warrant was not left behind by which to discover that it did not authorize officers to dispense with the announcement of identification and purpose requirement. There were no exigent circumstances. Since 2006, a growing national trend of such violations has established a need to revive suppression as a remedy. Officers are incentivized to violate to the extreme, to legally incapacitate their victim, preventing suit.

## Prejudice
All Exhibits that were used, would have otherwise been unavailable, resulting in a no-bill by the grand jury, or an acquittal by the petit jury.

## Argument
The "knock and announce" (K and A) requirement is a historical aspect of the Fourth Amendment. See Hudson v Michigan, 547 us 586 @589 (2006) ("in Wilson, we were asked whether the rule was also a command of the Fourth Amendment®®®we concluded that it was").

## Dissecting Hudson
The Hudson plurality was divided 4-1-4 on whether, and if so under what conditions, a K and A violation should or should not result in suppression. The split shall be referred to as thus:
Team never-suppress consisted of four justices (Scalia, Roberts, Thomas, Alito)
Team always-suppress consisted of four justices (Breyer, Stevens, Souter, Ginsburg)
Caught in the middle was justice Kennedy's crucial 5th vote, agreeing with different aspects of both. Each side purported to decide the issue facially as a categorical rule, however justice Kennedy restricted his concurrence with team never-suppress to its analysis of the law (Parts I-III, not IV), and only to the extent it applied to the facts of the case in an as-applied holding (concurrence), though justice Kennedy's decision could also be interpreted as merely tempering team-never's reach to only barring exclusion when a warrant actually exists at the time of the search. A majority decision seems to be that pre warrant violations are subject to suppression, while post warrant violations are not, but in all cases a civil remedy is available that cannot be Heck-barred. In this murky holding, assuming team-never won, *there was one crucial caveat to that holding*.

Team never-suppress *conditioned* its holding on the fact that nothing was presented to argue that deterrence could not be accomplished equally well through a civil damages suit. This portion of the opinion was joined by Justice Kennedy, and thus five justices. See Hudson@598 ("*As far as we know*, civil liability is an effective deterrent here"). Justice Kennedy was explicit on this point. See swingvote@604 ("Today's decision does *not* address any *demonstrated pattern* of knock-and-announce violations. If a *widespread pattern* were shown, and particularly if those violations were committed against *persons who lacked the means or voice* to mount an effective protest, there would be reason for grave concern"). Thus the Supreme Court envisioned at least two possible ways to achieve suppression, while another is merely compatible: 1) When a civil remedy as the deterrent is unsuccessful, or becomes unavailable, or otherwise fails to act as a deterrent. i.e. no possible deterrence. 2) An officer or municipality engages in a pattern, or a national trend is established. i.e. a demonstrated lack of deterrence. 3) The unreasonableness of a K and A violation, if not alone sufficient to suppress, may be factored into the *overall* unreasonableness inquiry towards suppression. See Birchfield v North Dakota, 138 S.Ct. 2160 @2186 (2016) ("reasonableness is always the touchstone of 4th-Amendment analysis").

In light of the Supreme Court's rational, the expired civil remedy, the vast stretch of time between that expiration and trial, and being told about this ground's potential: it was objectively unreasonable, and not a strategic choice, for decedent counsel to neglect in filing such a motion on its own weight or otherwise in support of a challenge to reasonableness under the 4th-Amendment, or further investigate the alternative "widespread pattern" escape clause.

**Civil deterrence is unavailable here and for detainees as a class**
In the first alternative, animating the "grave concern" in Hudson, the facts of this case present the increasingly more common factual scenario where K and A "violations [a]re committed against persons who lack[] the means or voice to mount an effective protest", namely by and through:
1) Officers initially withholding warrant documents and thereby preventing discovery of whether a no-knock was authorized. See e.g. US v Gantt, 194 F.3d 987, CA9 (1999) (collecting cases where warrant was withheld, holding it is only a statutory right with optional suppression).
2) The obligation to render the document and any other subsequent warrants are eliminated by arrest or instead "faux-satisfied by intending that it be left at unoccupied locations on account of that arrest (the faux obligation).
3) Warrants are categorically kept out of the hands of detainees (Central District of ill Local Rule 16.2).
4) Such detention (and accompanying document keep-away) is prolonged beyond the civil deterrence statute of limitations by either pretrial delay or conviction.

This removes the means of, and effectively silences the voice of, a sizeable and particularly vulnerable class of persons —detainees. Such functional elimination of deterrence in the form of a civil remedy until it is time-barred, leaves only suppression as a deterrent. To rigidly preclude suppression, signals to officers and local prosecutors, that 4th-Amendment violations can successfully be swept under the rug by withholding the warrant from the detained citizens to prevent discovery, in conjunction with prolonging trials past the statute of limitations. This is tantamount to telling officers, if you're going to violate, you'd better do it to the extreme to ensure legal incapacitation, so the victim can't sue. See also TeamAlways@605("Todays opinion is thus doubly troubling. it represents a significant departure from the court's precedents. And it weakens, perhaps destroys, much of the practical value of the constitution's knock and announce protection").

**A widespread pattern of violations exists**
In the second alternative, the "widespread pattern" sought by justice Kennedy's crucial and conditional fifth vote, was not only provided by the other four justices. See TeamAlways@610 (so stating and collecting cases). This pattern has continued to grow since 2006 when Hudson was decided, with notable news coverage of both Roger Stone, and also the killing of Briana Taylor's husband --a tragedy that could have been avoided by simply knocking and announcing, followed by being told they have the wrong house. Such surprises inevitably invoke fight-or-flight, and only the most docile residents survive. See e.g. Trent v Wade, 776 F.3d 368 @374, CA5 (2015) (sleeping resident: "you pulled a gun on me", officer: "you bet I did"). Unannounced entrances by strangers, and cornering a person in their own home, justifiably tends to invoke the gun in the nightstand...but an officer already has his drawn. Briana Taylor's husband's mistake was being half asleep and not being able to see past blinding flashlights. *unlike other constitutional rights, deterrence here saves lives.*

While some circuits have found a way to distinguish. See US v Weaver, 808 F.3d 26, D.C.App 2015 (analyzing Hudson and suppressing evidence found in house with *arrest* warrant after K and A violation). Other circuits have continued the slow determination of rights. See US v Sherrod, no. 18-2976, CA8, July-17-2020 (no announcement of identity or purpose required when door is open). Next are closed screen or glass doors, to the detriment of the nude or well-armed and easily startled in the next room. e.g. Lawrence v Texas, 539 us 558 (2003) and Briana Taylor respectively. cf Trent.

While Hudson is not so much the Berlin-wall, as it is a carefully guarded gate, the same systemic problem and lack of deterrence that led to overruling Wolf is present here, it is only a matter of time until such is realized like in Mapp. Team never-suppress repeats a mistake, where Team always-suppress has learned from history. See TeamAlways@607-8("in Mapp, the court overruled Wolf. Experience, it said, showed that alternative methods of enforcing the Fourth Amendment's requirements had failed"). No other constitutional violation carries with it the possibility of death, only a prompt counseled slap in the face will send a clear signal of deterrence and thereby save innocent lives. Surely loss of life should factor in too.

## 6th amendment speedy clause

### Standard of review
"We review a district court's denial of a constitutional speedy trial claim de novo and its factual findings for clear error"(us v. Bell, 925 F.3d 362 @375-6, CA7, 2019).

### Argument
### Assertion of the right
The court did not make a finding of when the right was asserted. The government asserts that the demand comes late and should be ignored on that basis akin to the "demand-waiver" expressly rejected in Barker. The government is factually incorrect in 3 respects. First, *counsel* made a demand as early as 2 years before trial. See R.39@46:2-4 ("Your Honor, I'd like to keep it [trial date] on a short leash because of the length of time he's been incarcerated"). Second, the government conclusively states without recitation of authority that *only counseled* demands for a speedy trial may be considered —our circuit and common sense dictate otherwise. See Bell@376("As to the third element, Bell *personally* and through counsel repeatedly made known his desire for a speedy trial"). The defendant's explicit and unequivocal assertion in November 2019 counts (See R.129). Third, this circuit is asked to join the 6th and DC circuits, which held in no uncertain terms: "we hold that a demand for reasonable bail is the functional equivalent of a demand for a speedy trial"(Cain v. Smith, 686 F.2d 374 @384, CA6, 1982), because just like in both circuits "the government fails to acknowledge [] that [defendant] continued throughout [his incarceration] to press his motion for release... for all relevant purposes the functional equivalent of pressing his right to a speedy trial" (ID@383-4 quoting Colloway, 505 F.2d 311 @316, D.C.App., 1974). Finally, even if late, our circuit in us v Macino, 486 F.2d 750, CA7 (1973) faced a situation where 3 -defendants filed a motion to dismiss at 28months (ID@751), the district had denied 2, but granted the other "because *he had [previously]* demanded a speedy trial" (ID@752); our circuit reversed the 2 denials, holding the 28month delay "was extraordinary" (ID@752), and should do the same here.

### Length
True to the plain text of the 6th Amendment, and what *should* be the most influential factor, the supreme court says a court must consider "whether the delay before trial was uncommonly long", but the judge did not make such a finding, and instead reduced this factor to a mere triggering mechanism, which for some it may be, "unless a presumptively prejudicial amount of time has elapsed in the district court"(us v. Oriedo, 498 F.3d 593 @597, CA7, 2007). If our circuit considers 28month's delay extraordinary for a complex multi-defendant case, surely a 35 month delay in a simple case with a single count and single defendant is no less extraordinary. See also Barker@531 ("the delay tolerated for an ordinary street crime is considerably less for a serious, complex conspiracy charge").

### Reason\blame for delay
The government boldly claims it "did everything it could to move this case forward" (R.147@6) without ever pointing to any specific examples; in fact the opposite is true. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉

The government cannot avoid itemization of continuances with impunity, as it conclusively points the finger at pro se motions, which *potentially* holds water for the speedy trial Act, but *not* the constitutional counterpart; which just like the ▓▓▓▓ conflicts on 9/13/17, 10/4/18, and 4/5/19 (which the government neglects to mention), none of the pro se filings or appeals themselves ever resulted in a delay of trial, but rather co-occupied some of the vast, numerous, and *preexisting* stretches of unconstitutional delay. The defendant cannot be penalized for making the most of a bad situation, after all *someone* had to try and keep things moving along. It was actually the *defendant* who made a good faith effort to speed things up, filing potentially dispositive motions and invoking a second and concurrent CJA attorney and consenting to phone conferences. The government's failure to ensure a speedy trial is all but conceded and all the more egregious in its admission that "it has been prepared to try this case since indictment"(147@2).

## Prejudice

The district court gave short shrift to this prong and summarily identified no prejudice in the form of an impaired defense, and in doing so committed the cardinal sin of "appl[ying] only half of the prevailing legal standard [which] is necessarily an abuse of discretion"(Pruitt v. Mote, 503 F.3d 647 @649, CA7 2007), which is also plainly erroneous in failing to consider the *other two* principal interests identified by the supreme court: 1) to prevent oppressive pretrial incarceration; and 2) to minimize anxiety and concern of the accused. See US v. Moss, 217 F.3d 426 @431-2 CA6, 2000 (holding that the district court erred when it "neglected to address any non-trial prejudice suffered by [the defendant]," including the "impact [of his incarceration] on his life circumstances").

Firstly, regarding an impaired defense, "excessive delay *presumptively* compromises the reliability of a trial in ways that *neither party can prove or, for that matter identify*"(Orido@600 quoting Doggett@655). The government would have such failure be dispositive, but the supreme court has continually emphasized that an affirmative showing of prejudice is *not* a prerequisite to establishing a speedy trial violation(Barker@533; Moore@26; see also us v. Strunk, 467 F.2d 969 @972, CA7, 1972, 412 us 434, 1973 (at 306 days, circuit and supreme court both found violation of speedy trial even though defense was not prejudiced by delay).

Secondly, regarding the other two independent sources of prejudice, the defendant was *very* detailed and specific in these types of prejudice, thus "the district court erred when it 'neglected to address any non-trial prejudice suffered by [the defendant]' including the 'impact [of his incarceration] on his life circumstances'"(us v. Bert, 814 F.3d 70 @82, CA2, 2016 citing Moss@431-2). The Supreme Court was forcefully explicit on this point, in Marion@320 where it said "inordinate delay [] may impair a defendant's ability to present an effective defense, *but the major evils protected against for the speedy trial guarantee exist quite apart from actual* or possible prejudice to an accused's defense". Personal prejudice was described at length in Barker[@532-3], and in the case at bar, Fredrickson detailed in depth his personal prejudice in two affidavits, one included at the end of Fredrickson's pro se motion (#129@26) that the government at least acknowledged exists; which expressly included by incorporation an earlier and significantly more detailed affidavit.

### Inherently Prejudicial Jury Influence

**Standard**

When juror(s) become aware of indica of custody, the prevailing test is whether there is inherent prejudice, absent which the defendant must make an affirmative showing of prejudice. The difference hinges on the level of risk of juror knowledge in custodial status. Appellate review is de novo, and any prejudicial influence must be "harmless beyond a reasonable doubt"(US v Halliburton, 870 F.3d 557, CA9, 1989).

## Argument

Knowledge is guaranteed, thus prejudice is inherent. Just *before* trial, Fredrickson was *absolutely* seen, scrutinized from three *feet* away, by the *whole* venire, for several *minutes*, without distraction, while the venire waited in the cold to be let into the Courthouse (see Court Exhibit 1). Fredrickson was spotted again in the out-of-state van by another juror on day 2 of trial. (See Court Exhibit 2). Each respectively followed by a motion for mistrial and juror strike. This is *not* the mere "3 to 4 *seconds*" exposure, to a *single* juror, with a view *obstructed* by officers through a door, that this court faced in both US v Traeger, 289 F.3d 461, CA7 (2002), US v Jones, 696 F.2d 479, CA7 (1982), and each case cited therein.

The court in both cases was not confronted with a reasonable sighting, upon which to charge knowledge and inherent prejudice. see Traeger@473("the district court expressed doubt that the juror even saw Traeger"), see Jones@493("it was unlikely that the juror even noticed [defendant] standing outside of the elevator"). At any rate, both circuit cases predated the Supreme Court in Deck v Missouri, 544 us 622, (2005), which reaffirmed the inherent prejudice resulting from having one's custody status known, and criticized the courts below for failing to recognize inherent prejudice rooted in the belief that the "negative effect [] 'cannot be shown from a trial transcript'"(ID@635 quoting Riggins v Nevada, 504 us 127 @137 (1992).

Following this case, Circuit Justice Posner, in Maus v Baker, 747 F.3d 926, CA7 (2014), authored a well-reasoned opinion, recognizing that:

> "The sight of a shackled litigant is apt to make jurors think they are dealing with a mad dog and the contrast between a litigant's wearing prison garb and his opponents' wearing law enforcement uniforms is likely to influence the jury against the prisoner, and has long been recognized as being highly prejudicial.
> ···Curative instructions have (as judges too rarely acknowledge) only limited officacy. As we said in US v Mazzone, 782 F.2d 757 @764, CA7 1986, 'we are not so naive as to believe that telling jurors not to think about something will cause them to forget it'. Justice Jackson once remarked that 'the naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction'(Krulewitch v US, 336 us 440 @453 1949). A 'curative' instruction can even have negative efficacy"(Baker@927-8).

To borrow a phrase from Justice Posner, "there would have been no reason for the jurors to think [him] a prisoner had it not been for his prison clothing", being parked less than three feet from the jury, and his suit being dragged through the crowded venire.

Alternatively, even if the court were to find no juror *saw* Fredrickson, directly through the clear windshield, lightly tinted side-window, or otherwise during the 15 minute exposure,

The jurors were more than capable of drawing the inference (as they are often asked to do) through legion context clues:

Jurors are frequently asked to make inferences, it would be unjust to deny reasonable juror inference here, when the context clues are legion:

1) While speaking to a Marshall that just slid through the throng of veniremen on the sidewalk, the transport officer said through an open window within earshot of the venire that they were here to "drop off Fredrickson". 2) The venire know they are there for a trial as the first matter of the day, and while waiting for the courthouse to unlock its doors, see *no* transport vans for about 20 minutes, before seeing *exactly one*, from a distant county in *Illinois* (despite standing in front of an *Iowa* courthouse), with exactly *one* person in it, and exactly *one* suit being brought in by Marshall Ryan (who also slides through the middle of the crowded venier waiting to get in at the same door, yet not let in). When finally let in, the jurors: a) see the same suit now on Fredrickson, b) see a single defendant consistent with the body-type of the mass in the van, c) hear the case is from Illinois, consistent with the transport van from Illinois (we are in court in Iowa). 3) now-juror Greta sees the *same* distant Mercer County Illinois van from yesterday, with the *same* body-type as the defendant, at the *same* time as trial *again* (its no coincidence). 4) Judge Mihm inadvertently calls attention to the situation by telling the jurors to ignore the missing counsel (what else could they be doing, but discussing these events or watching [court exhibits 1 and 2]). The jury was not oblivious, and prejudice is inherent.

Case notes
Treger cites
Us v. Halliburton ,870 F3d 557,ca9 1989
Us v. vanchase,137 F.3d 579,ca8 1998

Jones cites
Us v. carr,6674 F.2d 8b7,ca8 1981-walkrdpast jury panel in a hall before trial in cuffs & waist chain (no jail clothes?);"unsubstantiated allegation"," 'likely' saw", "possible brief glimpse", cites Robinson

Us v. Robinson, 645 f.2d 616,ca8 1981 – single Juror saw defendant in parking lot wearing cuffs & waist chain for "3 or 4 seconds" from 30-60 feet away. Juror testified seeing Marshall's custody but not chains & cuffs. Moved for mistrial but not strike.

Us v. wright, 564 f.2d 785, ca8 1977 – Marshall said "was a possibility" that Jurors may have seen defendants from "farther down the hall way" and court gave mitigating instruction(id@ 789).

Us v. Diecidue, 603 f.2d 535, ca5 1979-first time defendants were seen in business suits with non-uniformed marshals without badges(@549); second time single Juror saw hand cuffs; third time single Juror saw chains & cuffs but did not discuss with other and told not to ; court said it was asked to strike but then said it was never asked to strike.

Us v. Taylor, 562 f.2d 1345, ca2 1977- "there is considerable doubt·· whether the appellants were actually seen"(@1359); Judge took steps to cure.

Dupont v hall, 555 f.2d 15, ca1 1977 - elevator doors of Jurors opened on wrong floor "momentarily" where defendant "could be seen (unclear whether was).

The prevailing standard appears to be whether there is inherent prejudice, absent which the defendant must make an affirmative showing of prejudice. Appellate review is non- deferential de novo and the threshold for the effect of being seen is "harmless beyond a reasonable doubt".(see us v. Halliburton,870 f.3d 557,ca9 1989).

Without articulation the whole standard or taking a position of its own, the 7th circuit has noted that the 1st, 2nd, 5th, 8th, and 9th circuit all "hold" that "the defendant bears the burden of showing affirmatively that he was prejudiced by inadvertent exposure to the Jurors". The 7th circuit in us v. Traeger, 289 f.3d 461, ca7 2002 and us v. Jones, 696 f.2d 479, ca7 1982 noted that neither defendant even attempted to make an affirmative showing. As to superseding inherent prejudice, the court in each wasn't convinced that a Juror even saw the defendant('the district court expressed doubt that the Juror even saw treger"Traeger@473);"it was unlikely that the Juror even noticed[defendant] standing outside of the elevator"[Jones@493]).

Turning to the facts mitigating whether the defendant was seen, each involved a single Juror and only for a very brief moment. Traeger walked past an open door (id@472), and Jones had the mere "3 to 4 seconds" it takes for an elevator door to open/close (id@492-3). The facts of Fredrickson are a stark contrast; Fredrickson was observed, and by 60 people instead of 1. Fredrickson was scrutinized for 5 whole minutes, not "3 to 4 seconds". Fredrickson was also spotted again the next day, and all of the above was aggravated by the most damning of corroborating context clues(see below).

Finally, there was no waiver, as defense counsel sought mistrial both before and during trial, and tried to strike a twice offending Juror. Being seen cannot be reasonably recast in the mitigating light of one unable to afford bail, as such a theory would, due to long pretrial delay and being told when the alleged crime took place, include the equally prejudicial "he couldn't afford bail for 3 years?"

### Burden shifting (Prejudicial Instruction and Prosecutorial Misconduct)

There are 4 distinct components to this challenge, best taken together: 1) A legally incorrect instruction 2) Fact vouching based on this deficient instruction 3) improper shifting of the burden to the defendant 4) A denied instruction that would have prevented these injuries.

### Standard of review

"The due process clause prevents any state from placing on the defense the burden of persuasion on any element or fact necessary for conviction. If a reasonable juror *could* have understood a particular jury instruction as shifting the burden of persuasion on an element of a crime to the defense, the accused has been denied due process of law"(Williford v Young, 779 F.2d 405 @408 CA7 1985, omitting supreme court citations).

### The instruction

Instruction 21; "The internet is a means and facility of interstate commerce", seized a misstatement of the law. While it is certainly true that "the internet is a facility of interstate commerce"(US v Chaparro no18-2513 CA7 April 13 2020), it is *equally* true that "the use of internet alone is INsufficient to establish the required interstate nexus"(US v Biyilioglu, 652 Fed.Appx. 274 @28 CA5 (2016) citing US v Kieffer, 681 F.3d 1143 @1155 CA10 (2012). see also R.118. The same defect applies to instruction 22, as there is a key distinction between whether a cellphone CAN BE a means of commerce and IS such. by stating it *always is*, precluded the jury from deciding whether it *was here*. Similarly, instruction 20 (R.149@22) states that *mere communication* is commerce. To be sure, commerce *can* include these things, but the instruction says that, *without more*, travel from a living room to the kitchen or communicating across the dinner table *is always* commerce. This is legally incorrect, and the jury was prejudicially instructed.

In the more strict Habeas context, Fredrickson "need not demonstrate that it is more likely than not that proper objections to the jury instructions would have resulted in his acquittal. He need only establish that there is a reasonable probability, a better than negligible likelihood"(Garth v Davis, 470 F.3d 702 @718, CA7 2006 Rovnor dissenting). This certainly suggests a significantly more lenient standard on appeal, namely "harmless beyond a reasonable doubt".

Firstly, the seventh circuit has squarely held "that the prosecution cannot rest upon [congressional] special findings and definitions to establish the requisite effect on commerce"(US v Nerone, 563 F.2d 836 @854 CA7 (1977)), cited in R.118@1. yet this is the very thing it did *in support of* the instruction. see R.149@23 (citing "congressional findings" in the abstract), and fatally *with* the instructions.

Second, the prosecution intentionally misquoted case law to mislead the court, most prominently US v Schaefer, 501 F.3d **1197 @1204-5, CA10 (2007)**, to mislead the judge in support of the instruction (the full quote below, with Jennifer's selectively isolated sample in bold, true holding in italics):

> "However the true picture is more complicated. For example, the first circuit's decision in Carroll actually offers *little* support for the proposition that **internet use, standing alone, is sufficient to establish the jurisdictional element** of 2252. Carroll is fact-dependent and distinguishable. ··· *Significantly*, the Carroll court *never* questioned that there in fact be an intention to move photographs 'across state lines' --as opposed to simply an intention to place them on the internet. Accordingly, Carroll does *not* lend much support to the view that **proof of internet use, alone, is sufficient to establish the jurisdictional element** ··· In sum ···*there is no 'internet exception' to the statute's jurisdictional requirements.* Simply stated, *we decline to assume that Internet use automatically equates with a movement across state lines.* With respect to such interstate movement, *the government must introduce sufficient evidence to satisfy its burden of proof*"(Schaefer@1204-5).

Not only is it abundantly clear that the case is adverse, but this was the key reason for the reversal in the case

The reason for the holding is simple, the sending and receiving device could be within the same state or even city. We should be aware that the name obscures the meaning, for example if one uses the "interstate" to travel between two towns within the same state. Applied to this case, no evidence was presented to say any image was not *received* in Illinois (and beside the point, perhaps later moved to Iowa on foot [was evidence presented to the jury that my equip was seized in Iowa?]) In other words, mere use of the internet **alone was not enough. Nor was mere use of a cell phone, nor mere communication. The point is that it is likely the jury convicted on *any of these three* theories, as opposed to a permissible one. Even "a minor imprecision in the jury instructions can readily alter the outcome of a trial"(Garth@718, Rovnor dissenting).**

## Fact Vouching
The prosecution only magnified the problem, using mandatory language, and enforced by the faulty instruction, the prosecution stated: "if you find the defendant used the internet, you *MUST* find element #3 has been met"(R.___@_____). This *eliminated* the government's burden to prove the commerce

element (cf Nerone:"the prosecution cannot rest upon [congressional] special findings and definitions to establish the requisite effect on commerce"). This not only deprived the defendant of a fair trial, but we cannot be sure the jury didn't convict on this theory, especially when both mandatory language is used and backed by court instruction.

## Burden shifting
The instruction and fact vouch also shifted the burden to the defense to disprove this element in an impossible way. The instruction shanghaied the defense into either conceding this alternative element (though not met), or forcing it to prove innocence by showing that any *internet* movement occurred entirely in Illinois, a path destroyed on account of the instruction. This denied the defendant a fair trial. It is at all times the Government's burden to prove the *entire* element.

## Denied instruction
The District court and prosecution were surely on notice, as the defendant iterated these points in Dkt# 117, 118, and 131. The latter a foundational instruction written for the lay juror.

### Denied Theory of Defense v. Instruction on the Same

## Standard
"The defendant in a criminal case is *entitled* to have the jury *consider* any theory of defense which is supported by the law and which has some foundation in the evidence, however tenuous"(US v Briscoe, 896 F.2d 1476 @1512, CA7 1990).

## Argument
It is difficult to think of a fact more crucial than one going directly to an element, a point the defendant pressed. see R.117, Dkt#132, #158. Coercion is the polar opposite of consent, case and point —when officers pose a question to a defendant, courts frequently ascertain whether a response was the result of coercion or voluntary.

The theory of defense is not foreclosed by law. see §2243(a). While a child "who has not attained the age of sixteen"(ID), cannot consent to sexual conduct (and thus, of course, not a picture thereof either), a person who has attained the age of sixteen *can* consent to sexual conduct (see Ashcroft@247 citing §2243(a)), and there was clearly consent. There is a curious oddity, aside from the element "coerce", §2251 is silent about consent. see govt motion in limine 10 (R.84) ("2251(a) does not require any proof regarding consent. [] absence of consent is not an element of the offense"). The defense was barred from offering any evidence to refute the charged element of coercion. Consented and "coerced" are fundamentally incompatible, and the defense was precluded from pointing this out. When a court tells a defendant that an element is wholly off-limits, a fundamentally unfair trial results.

## Burden Shifting
Another instance of burden shifting occurred when AUSA Jennifer during closing arguments stated, again using mandatory language, "it is *not our burden* to prove he coerced her"(R___@_____). This is particularly egregious, not only because it is an element, but also because the defendant was denied the only theory of defense to refute this element

This error also implicates *another* specific constitutional guarantee. The 6th Amendment affords a defendant the right to a "meaningful opportunity to present a complete defense"(Crane v Kentucky, 476 us 683 @690 (1986)). "When specific guarantees of the Bill of Rights are involved", courts "take[] special care to assure that prosecutorial conduct in no way impermissibly infringes them"(Donnelly v DeChristoforo, 416 us 637 @643 (1974)).

please note: I am still developing these points and the law to go with it, I am waiting for the transcript to winnow/bolster arguments

**Conclusion**
Because a civil remedy was withheld here, and alternatively a pattern of obstructing civil deterrence exists, and alternatively a growing national trend of K and A violations exists --suppression is actually expressly authorized by a majority in Hudson. In the final alternative, because deterrence means future lives are saved, society has a very strong <interest> in such swift and clear deterrence.

Exhibit aksjd-1 (C.D.ill. local rule 16.2)

ΔΔΔput this eternally at the very end, a running exhibit list for all claims
Exhibit kfso-1 (Instruction 27 (R. 149 @29))
Exhibit 1xsewt-1 (instruction 15, R. 149@17 point 3)
Exhibit qmrhf-1 (19-cv-00121 Dkt# 24-3@10 and 11)
Exhibit qmrhf-2 (19-cv-00121 Dkt# 24-3@8)
Exhibit 1xsewt-2 (Dkt.149@18)

/s/ Tim W










⇔22005-026⇔
Timothy Fredrickson
Register Number 22005-026
P O Box 9000
Federal Correctional Institution Seagoville
Seagoville Texas, 75159-9000 -
Fiji

⇔22005-026⇔
District Clerk Of Court Cdil
600 E Monroe ST
Central District of IL
Springfield, IL 62701
United States

⇔22005-026⇔
District Clerk Of Court Cdil
600 E Monroe ST
Central District of IL
Springfield, IL 62701
United States